*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0417P (6th Cir.)
File Name: 01a0417p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

    v.

CHARLES E. RASHID
(99-2141); JACK RASHID
(99-2494),
    *Defendants-Appellants.*

Nos. 99-2141/2494

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-80670—John Corbett O'Meara, District Judge.

Argued: June 13, 2001

Decided and Filed: December 10, 2001

Before: JONES, SUHRHEINRICH, and DAUGHTREY,
Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Edward C. Wishnow, Birmingham, Michigan,
Richard M. Lustig, RICHARD M. LUSTIG LAW OFFICE,
Birmingham, Michigan, for Appellants. Jennifer J. Peregord,
ASSISTANT UNITED STATES ATTORNEY, Detroit,

Michigan, for Appellee. **ON BRIEF:** Edward C. Wishnow, Birmingham, Michigan, Richard M. Lustig, RICHARD M. LUSTIG LAW OFFICE, Birmingham, Michigan, for Appellants. Jennifer J. Peregord, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

NATHANIEL R. JONES, Circuit Judge. Defendants Charles and Jack Rashid appeal the conviction and sentence of the District Court. Jack pled guilty to conspiracy to commit money laundering and was sentenced to 78 months incarceration with credit for time served, three years supervised release, and restitution of $6,500,000.00. In a jury trial, Charles was found guilty and convicted on 24 of the 29 counts against him. He was sentenced to 37 months imprisonment, 3 years supervised release, and restitution of $6,500,00.00. Charles and Jack Rashid now appeal their convictions and sentences. The appeals were consolidated. For the reasons stated below, we **AFFIRM** the District Court's decision.

## I. Facts

On April 23, 1997, a grand jury sitting in the Eastern District of Michigan returned a multiple count indictment against three brothers, Jack, Charles, and George Rashid and their attorney, Jack Chilingirian. The indictment arose out of a scheme largely carried out by Jack and Charles Rashid to defraud investors in fraudulent business entities, based on actual or nearly-completed multi-million dollar contracts for the sale of radar braking systems and related radar technology. George pled guilty to a lesser charge and is not involved in this appeal.

In the 1950s, George Rashid, Sr., the Rashids' father, invented an automobile radar-based warning system which would warn of impending collisions. Over time, George

involves proceeds from specified illegal activities other than drug trafficking and organized crime. *See Ford*, 184 F.3d at 588. In *Ford,* the money laundering offense involved proceeds of illegal gambling, and the court held,

> the inclusion of gambling offenses within the money laundering statutes as "specified unlawful activities" shows conclusively that an offense is not outside the heartland merely because it involves gambling proceeds rather than drug or organized crime proceeds. There may, of course, be articulable reasons why a particular gambling case does not threaten the kind of harm Congress aimed at preventing, but [defendants] have not shown any. Without some showing of particular factors "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," *United States v. Reed*, 167 F.3d 984, 995 (6th Cir. 1999) (quoting 18 U.S.C. § 3553(b)), the district court should not depart.

184 F.3d at 588.

Likewise, in the case at bar, wire and mail fraud, were the underlying illegal activities that generated the proceeds at issue, and both offenses are included within the money laundering statutes as "specified unlawful activities." *See* 18 U.S.C. § 1956(c)(7)(A). Thus, the fact that Rashid's money laundering did not involve proceeds from drug trafficking or organized crime is not a sufficient reason for this Court to conclude that his offense was outside of the heartland for money laundering under the Guidelines. Thus, the District Court did not err in denying Rashid's motion to be sentenced under the fraud guideline.

## IV. CONCLUSION

For the reasons stated above, we **AFFIRM** the decisions of the District Court on all points.

described as a routine fraud case in which the money laundering activity was an "incidental by-product" of a kick-back scheme. 186 F.3d at 300. The court explained that the sentencing court must perform a "heartland" analysis when deciding what guideline should be applied *and* when deciding whether to depart. *See Id.* at 298 (emphasis added). Thus, in order to determine whether the money laundering guideline should apply, the court had to determine what conduct was considered by the Sentencing Commission to fall within the heartland of the money laundering guideline. The court considered the Sentencing Commission's proposed amendments to the money laundering guideline, which were rejected by Congress, and "conclude[d] that the Sentencing Commission itself has indicated that the heartland of U.S.S.G. § 2S1.1 is the money laundering activity connected with extensive drug trafficking and serious crime." *Id.* at 300.[11]

Thus, Rashid argues that because this case did not involve drug trafficking or organized crime, the money laundering guideline was not really meant to apply. This Court, however, has rejected the idea that an offense is outside of the heartland of the money laundering guidelines merely because it

---

[11]The Third Circuit has since clarified the holding of *Smith*:

Where money laundering is not 'minimal or incidental,' and is 'separate from the underlying crime' and intended to 'make it appear that the funds were legitimate' or to funnel money into further criminal activities, § 2S1.1 is an applicable guideline. The guideline may also be applicable if there is evidence that the activities which fulfilled the broad statutory requirements for money laundering were extensive with drug trafficking or other serious crime.

*United States v. Mustafa*, 238 F.3d 485, 495 (3d Cir. 2001) (quoting *United States v. Bockius*, 228 F.3d 305 (3rd Cir. 2000)). In this case, it could also be argued that even if this Circuit were to apply *Smith*, its rationale would fail to produce the result desired by Rashid. The money laundering in this case was not minimal nor incidental and the money appears to have been funneled through the client trust account in order to make it appear legitimate and in order to further the radar technology/fraud scheme.

---

Rashid, Sr. and his sons, Jack, Charles, and George, Jr., continued to refine the product. The appellants' father died in the early 1980s, but his sons carried on the family's company, Vehicle Radar Safety Systems, Inc. ("VRSS"). Charles served as the company's engineer, and Jack took care of administration and sales. The facts in the record do not specify George, Jr.'s role in the family business.

In 1988, the Rashid brothers began to solicit family, friends, and acquaintances to invest in "revolutionary" radar technology. In order to win investor confidence, the Rashids would display various fraudulent documents, including multi-million dollar "contracts" and "purchase orders," that purportedly represented actual or nearly completed business dealings with large corporations.[1] In addition to showing the documents, the brothers would also tell potential investors about other lucrative "deals" in the works. Using these methods, the Rashids persuaded several different groups of people to invest considerable sums in VRSS. The investors never saw a return on their money or received their original investments back.

Starting in May 1988, the first group to invest in VRSS was led by Steven Rozich.[2] The investors were promised high returns on their investments. They were shown VRSS documents representing "deals" with several large multi-national corporations, including General Motors, BMW, and Siemens Corporation. By 1990, however, some of the Rozich investors became concerned about "deals" that had never materialized and filed a complaint with the Michigan

---

[1]VRSS's secretaries testified that they typed numerous multi-million dollar "contracts," some of which were kept blank so the "contract" would be ready if an investor came into the offices. At trial, several witnesses from various corporations testified that the documents were false and contained forged signatures, and the court found that it was undisputed that the contracts did not really exist. (J.A. at 748).

[2]The "Rozich Group" also included Bob Mink, Larry Cheek, Joe Boyle, Charles Wright, and Raymond Shovers.

Department of Commerce. In early 1991, these investors and their attorneys met with Jack Rashid and the Rashid/VRSS attorney, Jack Chilingirian, to demand their money back.[3] They discussed the "contracts" that had formed the basis for the investment. Chilingirian offered a default judgment but no cash return, which was refused. Subsequently, after learning that certain "contracts" were indeed fraudulent, the Rozich investors again demanded return of their investments. The Rashids and Chilingirian denied any fraudulent activities and insisted there were actual "deals" in the works, but that the deals needed to remain confidential.

In January 1992, VRSS filed for bankruptcy protection, first in Chapter 11 and later converting to Chapter 7.[4] While these proceedings were pending, the Rashids were negotiating with Gencorp Aerojet, a California corporation, for possible purchase of the radar braking technology, or for VRSS in its entirety. In August 1992, Gencorp management informed the Rashids that there would be no deals between the companies. However, based on seeing signed "contracts" between VRSS and BMW and VRSS and Masco, a Detroit corporation, produced by Jack Rashid to encourage investment, a Gencorp Aerojet engineer, Charles Rudder, and others he brought in with him, decided to personally invest in VRSS.[5] One of the Rudder investor also brought in other investors, some of whom became themselves entangled in the Rashid fraud actions.[6]

---

[3]Chilingirian served as the counsel for the Rashids and VRSS from either 1988 or 1989 through the date of the indictment. He held a fifteen percent share in VRSS.

[4]Attorney Chilingirian handled the VRSS bankruptcy proceedings.

[5]The other members of the "Rudder Group" were Gary Rudder, Victoria Weston, and Len Jarrott.

[6]The "Hayden/Halek Group," consisting of Joe Hayden and Vince Halek, learned of VRSS through Gary Rudder. Hayden provided money to the Rashids, and, at the Rashids's request, was not entirely truthful

## D.  Fraud Guideline versus Money Laundering Guideline

Jack Rashid plead guilty to Count 33 of the indictment (money laundering) and his attorney, Jack Chilingirian, was found guilty on that count by the trial court. Judge O'Meara sentenced both defendants, but at different times and according to different sentencing guidelines. The judge sentenced Jack Chilingirian according to the sentencing guidelines for fraud (§ 2F1.1) and sentenced Jack Rashid according to the sentencing guidelines for money laundering (§ 2S1.1). The fraud guideline results in a significantly lower offense level. Thus, Jack Rashid argues on appeal that the district court erred by applying the fraud guidelines to Chilingirian and not to him.

Rashid argues that the District Court should have applied the lower fraud guideline instead of the money laundering guideline. By contrast, the government responds that the District Court's failure to depart downward is not reviewable. *See e.g., United States v. Hill*, 167 F.3d 1055 (6th Cir.1999), *cert. denied*, 528 U.S. 872, 120 S. Ct. 175 (1999). This is ordinarily true. However, during the sentencing hearing the court explained that it would deny Rashid's motion, which was based on *United States v. Smith*, 186 F.3d 290 (3d Cir. 1999), because "as a matter of law, I believe that this is a much different set of circumstances and because the Rule 11 Plea Agreement which agrees, on behalf of the Defendant, the Defendant himself agrees to a different calculation." (J.A. at 1016). It appears that the District Court's decision not to depart downward was based on its "legal conclusion that the circumstance urged by the defendant was not a valid reason for departure." Thus, the decision is reviewable. *United States v. Ford*, 184 F.3d 566, 585 (6th Cir. 1999). "The district court's legal determination that it lacked the authority to depart on the basis of a certain factor is reviewed de novo." *Id.*

Rashid heavily relies on *Smith* and the reasoning contained therein. In *Smith*, the Third Circuit held that the money laundering guidelines were too harsh to apply to what it

This court has held that a motion for downward departure based on substantial assistance must be made by the government. *See United States v. Levy*, 904 F.2d 1026, 1035 (6th Cir. 1990); *United States v. Delgado*, No. 94-3714, 1995 U.S. App. LEXIS 17763, at *22-23 (6th Cir. July 14, 1995). Moreover, the cases upon which defendant relies to argue that the court should be permitted *sua sponte* to depart based on defendant's cooperation with the government are no longer considered good law even in the circuits in which the cases were decided. In *In re Sealed Case*, 149 F.3d 1198, 1204 (D.C. Cir. 1998), the D.C. Circuit held that the district court was authorized to depart from the Guidelines based on a defendant's substantial assistance even where the government did not file a motion. However, that Court, sitting en banc, reheard the case and held that absent a government motion a district court could not downwardly depart based on the defendant's substantial assistance. *See In re Sealed Case No. 97-3112*, 181 F.3d 128, 142 (D.C. Cir. 1999). The en banc court expressly rejected the same argument that Jack Rashid makes here -- that even if the court lacks authority to depart under § 5K1.1 without a motion, § 5K2.0 provides an independent source of authority for departure. *See id.* at 140. In *United States v. Solis,* 161 F.3d 281 (5th Cir. 1998), the second case on which defendant relies to support his argument, was vacated on rehearing. The Fifth Circuit reconsidered its earlier decision, and, in a substitute opinion, the Court held "that § 5K2.0 does not afford district courts any additional authority to consider substantial assistance departures without a Government motion." *Id.* at 227. Therefore, per the clear decision of this Circuit and others, the District Court was correct when it stated that it could not grant a downward departure without a motion from the government.

circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence difference from that described. . . .". U.S.S.G § 5K2.0.

Through 1995, Chilingirian continued to assure investors that the Rashids were working on several "deals." He also attempted to quickly settle all the bankruptcy claims against VRSS and the Rashids, claiming that time was of the essence or the money available for settlement from a secret "lender" would become unavailable. The secret "lender" was a group of Canadian investors led by Paul and Ann Louise Tindall, who were related to Jack Rashid's wife. On several occasions, Jack Rashid showed the Tindalls various VRSS "contracts," one with BMW/Masco, another with Northwest Airlines. Working through Paul Tindall in June, 1995, Charles and Jack Rashid went to Toronto to exhibit the radar technology to a large group of potential investors, assuring everyone of the imminent BMW deal and stating that the money was already in escrow. The Canadians invested heavily in VRSS.

Later that year, the Rashids incorporated Advanced Radar Systems ("ARS") in Canada as a corporate entity for these foreign investments. Neither the Rashids nor Chilingirian informed the Canadian investors about the VRSS bankruptcy in the United States or that they planned to use the Canadian money to pay VRSS's creditors.

In 1996, Chilingirian and members of the Rudder group discussed settlement of the investor claims against the Rashids/VRSS. Some investors did get a portion of their money back, but they had to sign affidavits exculpating Jack Rashid. Despite numerous complaints from investors, Chilingirian continued to deposit money from the Kraft group into his client trust account and then withdraw amounts for himself and Jack Rashid.

Charles' trial was held from March 23 through April 20, 1999. Charles was found guilty on 24 of 29 counts against him. On September 15, Charles was sentenced to concurrent

about this money when deposed in the bankruptcy proceedings.

37-month custodial terms of all 24 counts.[7]  He was also assessed a $1,200 special assessment and ordered to pay restitution of $6.5 million.  On appeal, Charles argues that there was a constructive amendment to his indictment and that the court failed to issue a requested jury instruction.

On January 15, 1999, Jack Rashid pled guilty to Count 33 (conspiracy to commit money laundering).  On May 18, 1999, Jack filed a motion seeking to withdraw his guilty plea due to the government's refusal to recommend a § 5K1.1 downward departure for substantial assistance.  On December 13, 1999, Jack was sentenced to 78 months imprisonment and  three years' supervised release.  He was also assessed a $50 special assessment and ordered to pay restitution of $6.5 million.  On appeal, Jack Rashid argues that the government's refusal to file a § 5K1 motion warrants judicial review because the government did not act in good faith in its refusal.  Jack Rashid also alleges that the District Court erred by applying the fraud sentencing guidelines to Chilingirian and not to Jack Rashid.

## II.  STANDARD OF REVIEW

This Court reviews the question of whether there was an amendment to the indictment *de novo*.  *United States v. Robinson*, 904 F.2d 365, 368 (6th Cir. 1990), *cert. denied*, 498 U.S. 946 (1990).  "A district court's refusal to deliver a requested instruction is reversible *only* if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense."  *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991) (emphasis added).

---

[7]Charles Rashid was convicted on multiple counts of conspiracy to defraud the United States, aiding and abetting wire fraud and aiding and abetting mail fraud.

It is well settled that "absent a condition in the plea agreement that binds the government to move for a downward departure, [a defendant] is confined to arguing under *Wade* that the government failed to move for constitutionally impermissible reasons (such as race or religion)."  *United States v. Williams*, 176 F.3d 301, 308 (6th Cir. 1999) (citation omitted).  In fact, this Court has held that the district court was not required to conduct an evidentiary hearing where the plea agreement provided that the government would file a 5K1.1 motion "when and if the United States determines that the defendant has substantially assisted the Government," the defendant did provide some assistance but the government, without explanation to the court, declined to make the motion.  *See United States v. Bagnoli*, 7 F.3d 90, 91-92 (6th Cir. 1993).  However, in a recent unpublished opinion, this Court acknowledged that other circuits have held that it is appropriate to review for bad faith the government's failure to file a § 5K1.1 motion, specifically citing *Mikaelian*, on which defendant relies.  *See United States v. Abshire*, No. 99-5244 *4-5 (6th Cir. 2000)(order denying evidentiary hearing).  Nonetheless, the Court held that this Circuit's published precedent was to the contrary.  *Id.*

In the case at bar, the government expressly reserved the discretion to decide whether to move for a substantial assistance departure, and Jack Rashid has not alleged that the government acted with an unconstitutional motive when it elected not to file such a motion.  We see no reason to change the settled law of this Circuit.  Therefore, the District Court acted appropriately when it denied defendant's request for an evidentiary hearing.

In the alternative, Jack Rashid argues that even without a § 5K1.1 motion by the government, the District Court may make a downward departure based on defendant's cooperation under § 5K2.0 of the Guidelines *sua sponte*.[10]

---

[10]Section 5K2.0 provides, in relevant part, "the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds that there exists an aggravating or mitigating

It follows that a claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing. Nor would additional but generalized allegations of improper motive."

504 U.S. 181, 185-86.

In the instant case, Jack Rashid does not argue that the government had an unconstitutional motive for failing to move for downward departure. Rather, as stated above, he argues, based on case law from other circuits, that the government acted in bad faith.[9] Defendant's arguments on this issue have been soundly rejected by this Court.

---

[9] Jack Rashid primarily relies on *United States v. Mikaelian*, 168 F.3d 380 (9th Cir. 1999), and *United States v. Lezine*, 166 F.3d 895 (7th Cir. 1999). In *Mikaelian*, the Ninth Circuit stated that "[a]lthough the government has the discretion to decide whether to file the motion, it does not have the last and only word on whether a defendant provided substantial assistance." 168 F.3d at 385. "If the defendant protests that he did indeed cooperate and that the government is acting in bad faith in refusing to file a motion, a factual dispute arises, and the district court can determine whether in fact the defendant did provide substantial assistance as part of the bad faith determination." *Id.* This Court has rejected the argument that an allegation of the government's bad faith is sufficient to warrant judicial review of the government's decision not to file a § 5K1.1 motion. In *Lezine,* the Seventh Circuit held that the government had limited its discretion as to whether to file a § 5K1.1 motion by obligating itself in the plea agreement to make such a motion "assuming the defendant's full and truthful cooperation." *Lezine,* 166 F.3d at 903. Thus, that court distinguished *Lezine* from cases in which the government expressly affirmed its discretion by reserving the right, in its sole discretion, to decide whether or not to make such a motion. *Id.* at 902-03. Thus, the court was required to determine whether the defendant had satisfied the precondition of full and truthful cooperation. *Id.* at 903. The case at bar, on the other hand, is more similar to the cases distinguished by *Lezine* because the plea agreement expressly stated, "The government reserves the right to make the sole determination as to whether and when defendant has provided substantial assistance." (J.A. at 159.) Thus, even if this Court agreed with the Seventh Circuit, the rationale in *Lezine* would not apply here.

---

This Court reviews for clear error a district court's factual findings in its application of the Sentencing Guidelines. *See United States v. Jones*, 159 F.3d 969, 980 (6th Cir. 1998) (citing *United States v. Winston*, 37 F.3d 235, 240 (6th Cir. 1994)). However, the district court's application of the guidelines is review *de novo. See United States v. Moses*, 106 F.3d 1273, 1277 (6th Cir. 1997).

### III. DISCUSSION

Charles and Jack Rashid raise several issues on appeal. First, Charles argues that the presentation of evidence about the Rozich Group effected a constructive amendment to his indictment. He also alleges that the District Court's failure to issue his requested jury instruction was erroneous. By contrast, Jack argues that the District Court's refusal to recommend a § 5K1 departure was not in good faith. He also argues that the District Court should have applied the fraud guideline to his sentencing. However, the appellants' arguments lack merit.

### A. Variance/Constructive Amendment (Charles Rashid)

Charles Rashid argues that the admission of testimony by the first group of investors -- the Rozich Group -- effected a variance from the indictment that amounted to a constructive amendment. Charles asserts that the indictment did not refer to the Rozich Group and that evidence pertaining to the Rozich Group was about activities that occurred beyond the statute of limitations (prior to April 1992.). Therefore, he argues that the presentation of such evidence effectuated a constructive amendment which would warrant reversal.

The Fifth Amendment guarantees that an accused be tried only on those offenses presented in an indictment and returned by a grand jury. *Stirone v. United States*, 361 U.S. 212, 217-19, 80 S. Ct. 270, 273-74, 4 L.Ed. 2d 252, 257-59 (1960). "[T]the constitutional rights of an accused are violated when a modification at trial acts to broaden the charge contained in an indictment." *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989). "A *variance* [to the

indictment] occurs when 'the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.' In contrast, an *amendment* involves a change, whether literal or in effect, in the terms of the indictment." *United States v. Barrow*, 118 F.3d 482, 488 (6th Cir. 1997) (emphasis added).

Charles does not argue that the indictment was literally changed. He argues, rather, that the presentation of evidence about the Rozich Group had the effect of changing the conspiracy charge of the indictment (Count 1). Thus, he argues, this is a *constructive amendment*, which warrants reversal. "This Circuit has held that a variance rises to the level of a constructive amendment when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *Id.; see also United States v. Atisha*, 804 F.2d 920, 927 (6th Cir. 1986) (explaining that a constructive amendment occurs when "there has been a modification at trial in the elements of the crime charged"). The defendant has the burden of proof on this issue. *See id.* at 489.

There was no variance or constructive amendment in this case. The first count of the indictment charged Charles and Jack Rashid, along with Jack Chilingirian with conspiracy in violation of 18 U.S.C. § 371, and other counts charge the defendants with mail and wire fraud. The first two overt acts of conspiracy listed in the indictment pertain solely to the Rozich Group. Charles focuses on a part of the indictment that says, "Generally, the Rashids would solicit funds from a group of individuals through a contact person or persons, including, but not limited to, Gary Rudder, Joseph Hayden, Paul Tindall and Boyd Kraft," and the fact that no one from the Rozich Group is included in this list. Especially considering the fact that overt acts were listed which involved only the Rozich Group, and the fact that the above excerpt

to determine whether the defendant had provided substantial assistance. Thus, the court stated that it would not substitute its judgment for the government's and denied the motion for an evidentiary hearing. Similarly, the court denied defendant's motion to depart downward, but did so without prejudice to the defendant's raising the motion orally at the time of sentencing. Jack Rashid did renew this motion during sentencing, but the court denied the motion stating that such a motion must come from the government.

Jack Rashid argues that the government's refusal to file a § 5K1 motion for downward departure was not made in good faith. Jack contends that he satisfied his obligations under the agreement and that this Court should remand to the district court to conduct an evidentiary hearing to determine whether the government was acting in bad faith. He argues that if this Court determines that the defendant did provide substantial assistance and that the government was acting in bad faith, then the district court should compel the government to file a downward departure motion. In the alternative, Jack Rashid argues that the district court should be permitted to depart for cooperation without a § 5K1.1 motion from the government.[8]

In *Wade v. United States,* 504 U.S. 181, 185-86, 112 S. Ct. 1840, 1843-44, 118 L.Ed 2d 524 (1992), the Supreme Court said:

"[W]e hold that federal district courts have authority to review a prosecutor's refusal to file a substantial-assistance motion and to grant a remedy if they find that the refusal was based on an unconstitutional motive. Thus, a defendant would be entitled to relief if a prosecutor refused to file a substantial-assistance motion, say, because of the defendant's race or religion.

---

[8]U.S. Sentencing Guidelines Manual § 5K1.1 provides that "upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines."

the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991) (emphasis added). Thus, because the requested instruction contained an incorrect statement of the law, the district court did not err in refusing to issue the instruction.

## C. Departure for Substantial Assistance (Jack Rashid)

On January 15, 1999, Jack Rashid entered into a Rule 11 plea agreement in which he pled guilty to conspiracy to commit money laundering. The agreement provided that Jack's sentence would not exceed 78 months. The agreement further provided that "[u]pon the government's determination that defendant's cooperation amounts to substantial assistance in the investigation of others, the government will request the court to depart downward from the applicable sentencing range. The government reserves the right to make the sole determination as to whether and when defendant has provided substantial assistance." (J.A. at 145). According to Jack Rashid, he spent over forty hours providing assistance to agents and attorneys for the government. Nonetheless, the government elected not to file a motion for downward departure based on substantial assistance under § 5K1. The government informed Jack's attorney that Jack had not been fully cooperating in good faith.

On May 18, 1999, Jack Rashid filed a Motion to Withdraw Guilty Plea. In the alternative, the defendant moved for downward departure based on his cooperation, and argued that the court should be able to depart on this basis *sua sponte*.

The District Court denied defendant's motions. First, the court, in agreement with the argument submitted by the government, determined that the Presentencing Report's enhancement for obstruction of justice was appropriate. Therefore, the cap in the plea agreement was within the guideline range and the court could sentence defendant within the terms of the plea agreement. Second, the court concluded that the plea agreement reserved to the government the right

explicitly says "not limited to," Charles' argument that the name of one of the Rozich Group members who testified at trial should have been included in the indictment is unpersuasive. Moreover, according to the indictment, the conspiracy lasted from 1998 through April 1997, and all of the evidence of the Rashids' involvement with the Rozich Group concerns activities that took place within the dates of the conspiracy identified in the indictment. Thus, this case is not parallel to the cases relied on by Charles Rashid in which the jury was permitted to consider proof of facts that were substantially different from the offense alleged in the indictment. *See, e.g., United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989) (finding constructive amendment where indictment charged defendant as being in possession of a firearm on September 28, 1987 and court allowed jury to consider proof of possession on another occasion to satisfy the charge.)

As for Charles' argument that the variance amounted to a constructive amendment because the Rozich Group evidence predated the time frame under consideration in accordance with the statute of limitations, this argument is based on inaccuracies as well. For instance, one of the overt acts listed, the November 1992 meeting, did take place within the applicable time frame. As such, some of the evidence about the Rozich Group did involve activities that took place during the relevant period of time.

However, the government did introduce evidence of activities that took place prior to the allowable time frame. But, the government is permitted to introduce evidence of early conspiratorial conduct that is insulated from prosecution by the statute of limitations, "as long as the conspiracy subject to trial has continued into the permissible prosecutable period and an overt act in furtherance of the conspiracy has been committed during that period." *United States v. Flores*, 538 F.2d 939, 943 (2d Cir. 1976) ("although prosecution of an earlier offense may be barred, it has long been established that evidence of that offense may nevertheless be introduced to prove a later crime which the government is permitted to

prosecute."). In fact, this Circuit has held that even when evidence is presented of activities that occurred outside of the conspiracy dates charged in the indictment (as opposed to the statute of limitations dates), that did not constitute a fatal variance. *See United States v. Manning*, 142 F.3d 336, 340 (6th Cir. 1998) (holding that evidence of meeting between drug conspirators which occurred shortly before beginning date of the conspiracy as charged in indictment was minor variance); *United States v. Zelinka*, 862 F.2d 92, 97-99 (6th Cir. 1988) (evidence of drug deals occurring after ending date of conspiracy as charged in indictment was not fatal variance).

In sum, the introduction of the evidence concerning the Rozich Group did not prove facts that were substantially different from those set forth in the indictment and did not create a likelihood that Charles Rashid would be convicted of an offense that was not charged in the indictment. Therefore, the jury properly considered this evidence and appropriately determined Charles Rashid's guilt in this case.

**B. Jury Instructions (Charles Rashid)**

Charles Rashid next argues that the District Court erred by failing to issue the following jury instruction at his request:

CONSIDERATION OF CERTAIN EVIDENCE PRESENTED WITH RESPECT TO COUNT I
Evidence has been presented with respect to Defendant Charles Rashid's relationship in connection with individuals identified as Stephen Rozich, Robert Mink, Joseph Boyle, Chuck Wright, Larry Cheek, and Raymond Schovers. In order to find Defendant Charles Rashid to have committed Count I, that is conspiring to commit the crimes of wire fraud and mail fraud, based on testimony and evidence introduced pertaining to Stephen Rozich, Robert Mink, Joseph Boyle, Chuck Wright, Larry Cheek, and Raymond Schovers, you must find that he committed an act in furtherance of mail fraud or wire fraud as further described in these instructions pertaining to the Rozich group of individuals.

If the evidence and testimony does not convince you beyond a reasonable doubt that Charles Rashid committed an act in furtherance of a mail fraud or wire fraud offense with respect to Stephen Rozich, Robert Mink, Joseph Boyle, Chuck Wright, Larry Cheek, and Raymond Schovers as further described in these instructions, you must find the Defendant Charles Rashid not guilty of the conspiracy count as it relates to the Rozich group of investors.

(J.A. at 983).

The District Court properly refused to give this instruction on the basis that it contained an inaccurate statement of law. Contrary to Charles' instruction, the government was not required to prove that Charles Rashid "committed an act in furtherance of mail fraud or wire fraud . . . pertaining to the Rozich group of individuals." (J.A. at 983). Rather, as the relevant Sixth Circuit Pattern Jury Instruction provides, "the government must prove that at least one of these [overt] acts was committed by a *member* of the conspiracy." Pattern Crim. Jury Instr. 6th Cir., No. 3.04 (emphasis added); *see also United States v. Strong*, 702 F.2d 97, 100 (6th Cir. 1983) (stating that to prove a conspiracy under 18 U.S.C. § 371, the government must show: "(1) the conspiracy was willfully formed and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) *that at least one of the conspirators thereafter knowingly committed* at least one of the overt acts charged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy." (emphasis added)), *United States v. Hoy*, No. 95-3698, 1996 U.S. App. LEXIS 22256. at *19-20 (6th Cir. Aug. 3, 1996) (citing *Strong* for the same elements).

The District Court did not commit reversible error here. "A district court's refusal to deliver a requested instruction is reversible *only* if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in