RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0228P (6th Cir.)
File Name: 02a0228p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    *v.*

ALVIN LEE LEWIS,
        *Defendant-Appellant.*

No. 99-6281

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 99-00033—Thomas A. Higgins, District Judge.

Submitted: September 12, 2001

Decided and Filed: July 11, 2002

Before: SILER, CLAY, and GIBSON, Circuit Judges.[*]

_____

### COUNSEL

**ON BRIEF:** Henry A. Martin, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Byron M. Jones, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

---

[*]The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

---

**OPINION**

---

JOHN R. GIBSON, Circuit Judge.   Alvin Lee Lewis appeals from the sentence that followed his conviction on twelve counts relating to the manufacture and sale of unauthorized satellite television access devices.[1]  Along with an order of restitution, Lewis was sentenced to multiple concurrent terms of imprisonment, some for 72 months and others for 60 months, followed by three years of supervised release.  He argues that he should have been sentenced under the fraud sentencing guidelines rather than the money laundering guidelines, thereby reducing his term of imprisonment.  We AFFIRM the sentence imposed by the district court.

I.

In its authorized use, digital satellite television viewing is available to individuals who have purchased the requisite components of a system and who pay a subscription fee or individual viewing charges to the program provider.  A system includes a receiver, a computer access card, and the familiar dish-shaped antenna.  The programs that are sent via satellite are scrambled, and the access card has a computer chip that decrypts the programming that the customer has paid to view.

---

[1] Lewis was convicted of manufacturing and selling unauthorized access devices and conspiracy to do so, in violation of 47 U.S.C. § 605(e)(4) & 18 U.S.C. § 371; manufacturing and selling and interstate transportation of surreptitious interception devices, in violation of 18 U.S.C. §§ 2512(1)(a) & (b); fraud by use of commercial interstate carrier, in violation of 18 U.S.C. § 1341; wire fraud, in violation of 18 U.S.C. § 1343; money laundering and conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(h) & (a)(1)(A)(i); and aiding and abetting as to all of the non-conspiracy counts, in violation of 18 U.S.C. § 2.

Not every viewer is authorized, however. Hackers find ways to replicate the access cards. Once replicated, the cards are sold to viewers who can then watch the programs without paying the provider. The industry responds by creating electronic counter-measures to detect and render inoperable any unauthorized access cards. Not to be outdone, hackers create printed circuit boards for the receivers that in turn block the electronic counter-measures. These items are advertised through internet sites and in magazines.

In late May 1998, Lewis and his nephew Brandon Scott conversed with an individual who, unknown to them, was an investigator for a company that provides encryption technology for satellite transmissions. The investigator, William Sutherland, had seen an internet posting which listed BOSS cards for sale. BOSS is a trade name for printed circuit boards with computer chips that are programmed to allow unauthorized satellite users to protect their pirated signals by blocking the electronic counter-measures employed by the industry. Sutherland sent an e-mail inquiry and in reply was directed to a telephone number. When he called the number, Scott answered. In their ensuing conversations, Scott told Sutherland that he was selling access cards for $75 and BOSS blocker cards for $199. Sutherland ordered two of each card from Scott. Later that day Lewis called him, saying that he wanted to "become a little bit better acquainted" before doing business with him. To the point, Lewis asked if Sutherland was affiliated with DirecTV (a satellite television programmer) or NDS (a supplier of encryption technology to programmers including DirecTV and in fact Sutherland's employer[2]) or any law enforcement agency. Sutherland said that he was not. Seemingly satisfied, Lewis told Sutherland that he would get the cards the following week.

When Sutherland did receive the cards, he forwarded them to the person in charge of unauthorized user investigations for NDS Americas. Sutherland learned that the cards did not

---

[2]Sutherland identified the company name as "NDS Americas."

function, and called Scott to tell him that. He also told Scott that he would be interested in placing a large order in the future if these cards operated satisfactorily. Scott agreed to make them right, but when Sutherland received them a second time, they still did not operate correctly. Sutherland told Scott that the second batch was also bad, and Scott directed him to return them. After inspecting the cards, Scott said one of them had been "fried" and that he would replace it for $100. Sutherland agreed, Scott replaced the cards and sent them to Sutherland for a third time, and this time they functioned. Upon Scott's instruction, Sutherland paid for the items with personal money orders made payable to Lewis.

Sutherland then began negotiating with Scott and Lewis for the purchase of 50 access cards and 50 BOSS (by now BOSS II) cards. During this time Sutherland advised the Secret Service of his activities and, at the agency's request, recorded four of his own telephone conversations with both Scott and Lewis. Lewis assured Sutherland that he could deliver the product even though he would be away on a trip to Russia for a month. He said that his nephew Scott could speak for him and could handle the transaction in his absence. Lewis, Scott, and Sutherland ultimately agreed to a price of $12,000 for 50 of each card, which Sutherland would pay for with two cashier's checks in the amount of $6,000 each. Sutherland traveled to Nashville to meet with Scott and discuss the details of the transaction. When they met again near Nashville less than two weeks later to consummate the deal, Secret Service agents were present at the restaurant that was their agreed-upon meeting place. After Sutherland and Scott exchanged the cards and the payment for them, Secret Service agents approached Scott and asked him to go outside to talk. He accompanied them but began running once he reached the out of doors. The agents were able to stop him and he was handcuffed by local police officers.

The Secret Service also obtained a search warrant for the house that Lewis and Scott lived in. Upon arresting Scott, an agent asked him if he wanted to be present during the execution of the warrant. He said that he did, and the search

that has been proposed and rejected does not provide legal authority for a downward departure. *United States v. Morelli*, 169 F.3d 798, 809 n.13 (3d Cir. 1999).[5]

We affirm the judgment of the district court.

---

[5] As is pointed out in Section II, *supra*, the same analysis applies to a choice between guidelines and a departure. It follows, then, that neither does a rejected amendment provide legal authority for choosing one set of guidelines over another. Either way Lewis frames the argument, it cannot succeed.

to be treated differently, the policy statement found at Ch. 1, Pt. A, 4(b) of the Guidelines Manual states that it must be determined to be outside the heartland, defined as "a set of typical cases embodying the conduct that each guideline describes."

The *Ford* panel held that a district court should not depart without some showing of particular factors that were not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. Departure in a sentence for money laundering is not warranted merely because the operative facts did not involve drugs or organized crime. 184 F.3d at 588. The holding of *Ford* is therefore consistent with *Chilingirian* and *Rashid*, and under either analysis we conclude that the district court did not commit legal error.[4]

IV.

Lewis also argues that he should not have been sentenced under the money laundering guidelines because he was named in those counts only to "up the ante" for going to trial. He points out that he and his nephew Scott were both charged with the same four counts in the original indictment, but that in the superseding indictment only he was charged with money laundering. He suggests that the history of the case raises an inference that the money laundering counts were designed to facilitate Scott's guilty plea and force Lewis to plead guilty as well. Lewis asserts that this sort of manipulative prosecution practice was one of the reasons the Sentencing Commission urged amending the money laundering guideline. *See generally Smith*, 186 F.3d at 298-99 (recounting history of proposed amendment and congressional rejection).

While we do not reject the plausibility of Lewis's argument, it cannot stand as a basis for our decision. An amendment

---

[4]Because this first required element of plain error review is absent, we need not consider the remaining elements.

was conducted upon his arrival at the house. Agents seized a number of items during the search, including: two computers, one with an attached programmer; access cards; more than one thousand computer micro chips; circuit board components and printed circuit boards; several satellite receivers; $8,380 in cash and nearly $8,000 in money orders, most of them made payable to Lewis and others to Scott; several dish antennae; and a notebook with instructions on how to program one of the computer chips.

Following the search, the Secret Service invited an NDS Americas analyst to participate in analyzing some of the seized items. In so doing, the analyst determined that 104 of the 127 access cards were modified for satellite reception, and that the computers contained software which (in conjunction with the written directions from the notebook) could create the access cards.

Lewis was indicted, re-indicted, and tried. At trial, the government presented seven witnesses who testified that they purchased access cards and/or BOSS cards from Lewis, whom they learned about through either a topical magazine or the internet. Another witness testified that he had written a review of the BOSS card in that magazine at Lewis's request. After its publication, Lewis contacted him again to tout a new product he planned to introduce for another satellite system, but the individual no longer wrote for the magazine and told Lewis he could not help him.

Scott also testified as a government witness at Lewis's trial, and detailed his activities in assembling circuit boards, programming access cards, and dealing with customers on his uncle's behalf. He was 21 years old at the time of trial. Scott testified that he had moved to Tennessee to live with Lewis because he needed a place to stay and he didn't like California, where his mother lived. He had hoped to return to school after making some money working for his uncle, although he did not know at the time what his uncle's business was. He apparently learned quickly because, not long after he arrived, Lewis traveled to Russia on two

occasions and left Scott in charge of business. The first was a 17-day trip and the second lasted for two months. During his absences, Scott filled orders, put together cards, programmed access cards, and generally kept the business running.

The search of Lewis's house occurred in August 1998, during one of his trips to Russia. Scott testified that he telephoned Lewis to tell him of the search and seizure, and that Lewis reacted without concern and directed him to continue carrying on the business. Even though Scott understood that the activities were illegal, he did continue to the extent finances would allow. In early 1999, Scott began cooperating with the government as it continued its investigation of Lewis. At the time, Scott was engaged in his own satellite television-hacking enterprise that did not include Lewis, but Scott was not truthful in telling the government about his activity.

The money laundering counts against Lewis were based on bank deposits to Scott's account and checks written on that account. Scott testified that Lewis had told him to purchase access cards from Tom Cleary if he needed more to fill orders while Lewis was in Russia. Scott did so, and he paid Cleary for the cards by writing checks on his bank account. Scott also made deposits to that account from payments he received for selling access and BOSS cards.

Lewis took the stand at trial. He denied having sold any illegal devices related to the satellite television industry and he denied knowing that Scott sold any such devices while he was living in Lewis's home. He portrayed himself as a jeweler who imports jewels and precious metals for resale in the United States and elsewhere. He said that he also sold printed circuit boards for a short time in early 1998, but they were not in any way illegal. He denied knowing what the BOSS card is or asking that it be reviewed for publication in a topical magazine.

Scott and Lewis were originally indicted for conspiracy and trafficking in unauthorized access devices but, as a

and remanded with instructions to sentence Chilingirian under the money laundering guidelines. *Id.*

Chilingirian's case points the way to resolving Lewis's. Chilingirian was sentenced within two months of Lewis. 280 F.3d at 708 (reciting Chilingirian's sentencing date as October 18, 1999); Appellant's Brief at 6 (sentencing hearing date was August 30, 1999). While both were sentenced before the guidelines amendment became effective, that does not negate the impact of the change. Where a future amendment is intended to clarify an existing guideline, the amendment is to be "given substantial weight in determining the meaning of the existing guideline." *United States v. Luster*, 889 F.2d 1523, 1529 (6th Cir. 1989). Just as it was appropriate for the *Chilingirian* panel to consider the amendment, it is proper for this panel to recognize the clarification that the amendment provided. We therefore conclude that the district court did not err in sentencing Lewis under the money laundering guidelines.

### III.

We also reach the same conclusion through an alternative analysis that is suggested by another opinion of this court. Both *Chilingirian* and *Rashid* relied on *United States v. Ford*, 184 F.3d 566 (6th Cir. 1999), which was issued some two weeks before the Third Circuit filed its opinion in *Smith*. *Ford* also included a challenge to sentences imposed under the money laundering guidelines.

In an approach different than that of the Third Circuit, *Ford* analyzed the issue using 18 U.S.C. § 3553(b) (2000) and a policy statement by the Sentencing Commission describing the meaning and boundaries of "heartland." 184 F.3d at 586. Under § 3553(b), district courts are to sentence within the guideline range unless there is some circumstance not adequately taken into account by the Commission. To determine whether a given circumstance has been adequately considered, the statute directs that courts "shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." For an offense

controlling opinions in the companion cases of *United States v. Chilingirian*, 280 F.3d 704 (6th Cir. 2002), and *United States v. Rashid*, 274 F.3d 407 (6th Cir. 2001). Chilingirian was indicted on several counts, including fraud, but was convicted following a bench trial only of conspiracy to commit money laundering. *Chilingirian*, 280 F.3d at 708. Rashid, who was allegedly involved in illegal activities with Chilingirian, pled guilty to one count of conspiracy to commit money laundering. *Rashid*, 274 F.3d at 412.

Following their convictions, Chilingirian was sentenced under the fraud guidelines and Rashid was sentenced under the money laundering guidelines. *Id.* at 419. The government cross-appealed Chilingirian's sentence, arguing that he should have been subject to the money laundering guidelines. *Chilingirian*, 280 F.3d at 713. Rashid appealed his sentence to the same panel, asserting that the district court should have applied the fraud guidelines to him as it did with Chilingirian. *Rashid*, 274 F.3d at 419.

Rashid relied on the Third Circuit's conclusion in *Smith* that the heartland of the money laundering guideline was activity connected with extensive drug trafficking and organized crime. This court rejected that conclusion. It held that the district court had not erred by finding that his money laundering conduct remained in the heartland even though it did not involve proceeds from drug trafficking or organized crime. *Id.* at 419-20. The *Chilingirian* opinion followed, and it similarly rejected the application of *Smith*, giving two further reasons. First, the Third Circuit itself had modified *Smith*'s interpretation of § 2S1.1 to extend its applicability beyond those situations where money laundering occurred in the context of "drug trafficking or other serious crime." *United States v. Mustafa*, 238 F.3d 485, 495 (3d Cir. 2001). Second, the guidelines language the *Smith* court relied on had been modified in the 2000 amendment. The court concluded that since "the sentencing court is now required to use the guideline that Appendix A says is applicable[,] . . . the *Smith* approach is no longer relevant." *Chilingirian*, 280 F.3d at 714. Accordingly, the district court's sentence was reversed

consequence of Scott's continuing cooperation, the government sought and obtained a superseding indictment. In it, Scott and Lewis were jointly charged with four counts of conspiracy and substantive offenses relating to unauthorized devices, and Lewis alone was charged with four counts of fraud, wire fraud, conspiracy, and two counts of money laundering. Scott entered into a plea agreement with the government that was accepted by the district court on the eve of Lewis's trial. He was later sentenced to three years' probation, including four months of home detention.

Lewis was convicted by a jury on all 12 counts. At sentencing, the district court adopted the guidelines application as proposed by the presentence report (with one exception that resulted in a decrease in Lewis's offense level). The offenses were deemed related for purposes of the guidelines and were therefore grouped for sentencing. The district court accepted the presentence report's conclusion that the offense level for the group would be for the most serious of the counts, money laundering. Lewis's counsel did not object. Lewis received multiple concurrent 72- and 60-month sentences. He was also ordered to pay restitution in an amount to be determined by a civil suit filed by DirecTV against Lewis. Judgment was entered against Lewis in the civil suit in the amount of $12,500,000.

## II.

Lewis argues that the elements of money laundering present in the scheme for which he was convicted were incidental to what was basically a pattern of fraud. Therefore, he argues that his sentence should not have been calculated under the money laundering guidelines, but rather under the more lenient fraud guidelines. He acknowledges that our review must be for plain error because he failed to raise this objection with the district court. *United States v. Olano*, 507 U.S. 725, 731-32 (1993); *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998) (holding that defendant's failure to raise a timely objection to a sentencing decision in the district court

does not preclude discretionary plain error review).[3] Plain error is an error that is both clear under current law and affects substantial rights. *Olano*, 507 at 732-34. Moreover, relief is proper only if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Cotton*, 122 S. Ct. 1781, 1785 (2002) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

Lewis does not argue that the district court erred by grouping the counts for purposes of sentencing. *See* U.S.S.G. § 3D1.2(b) (counts involving the same victim and two or more transactions constituting part of a common scheme or plan shall be grouped). While Lewis characterizes the alleged error as both a misapplication of the guidelines and a failure to depart based on conduct outside the heartland of money laundering cases, this court's analysis is the same regardless of the label he places on the argument. *See United States v. Chilingirian*, 280 F.3d 704, 714 (6th Cir. 2002) ("Whether this court views the district court's action as a choice between guidelines or a departure, the result is the same. The heartland analysis that should be applied prior to determining which guideline applies is identical to the analysis that should be applied in determining whether a departure is warranted.").

Lewis urges us to be guided in our analysis by the Third Circuit's opinion in *United States v. Smith*, 186 F.3d 290 (3d Cir. 1999). In *Smith*, two defendants were convicted of conspiracy to defraud, interstate transportation of stolen property, causing unlawful interstate travel with intent to distribute stolen property, and money laundering. *Id.* at 296-97. The district court grouped the counts for sentencing and followed the instruction of U.S.S.G. § 3D1.4 to choose the highest offense level. As in this case, the highest offense level was for money laundering. On appeal, the Third Circuit conducted a thorough examination of the history of the money

---

[3] The district court's sentencing decision would not be reviewable if it were merely a decision not to depart. However, because this is a legal determination as to the permissibility of a basis for departure, it is reviewable. *See United States v. Ford*, 184 F.3d 566, 585 (6th Cir. 1999).

laundering guidelines, including proposed changes, judicial criticism, and congressional inquiries into money laundering prosecution practices of the Department of Justice. *Id.* at 298-300. *Smith* reversed, holding that the defendants should have been sentenced under the fraud guidelines because they were convicted on a kickback scheme of which the money laundering was an "incidental byproduct." *Id.* at 300. Relying on Appendix A to the Guidelines Manual, the court concluded that the defendants' money laundering conduct was atypical in comparison to the heartland of money laundering cases and that the fraud guidelines were more appropriate. *Id.* at 297. The court viewed it as a routine fraud case and reversed the sentence because to do otherwise would be like letting the "tail wag the dog." *Id.* at 300; *see also United States v. Woods*, 159 F.3d 1132, 1133-34, 1136 (8th Cir. 1998) (holding that district court did not abuse its discretion in concluding that money laundering activity was outside heartland and granting downward departure where underlying offense was bankruptcy fraud).

The government argues that *Smith* is no longer good law because the Sentencing Commission deleted the language in the Appendix that the court relied on. That deletion was part of Amendment 591, which addressed the inter-relationship between various application provisions. The Commission explained its reason for amending the Appendix and related provisions, stating that some of the language had resulted in "confusion in applying . . . principles to determine the offense conduct guidelines in Chapter Two most appropriate for the offense of conviction." Language was deleted that had "been used by some courts to permit a court to decline to use the offense guideline referenced in the Statutory Index in cases that were allegedly 'atypical' or 'outside the heartland.' *See United States v. Smith*, . . . ." U.S.S.G. supp. to app. C, amend. 591. This amendment did not become effective until November 1, 2000, *id.*, more than one year after Lewis was sentenced.

We need not decide whether to accept or reject *Smith*. After this case was briefed and argued, this court issued