**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jeffrey PHILLIPS; Defendant–
Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Anthony Davis, also known as Anthony Actavious Davis, also known as Clarence Anthony Epps, Defendant–Appellant.**

**Nos. 01–6483, 02–5027 and 02–5071.**

United States Court of Appeals,
Sixth Circuit.

Sept. 8, 2003.

Tracy L. Berry, Asst. U.S. Attorney, U.S. Attorney's Office, Memphis, TN, for Plaintiff–Appellee.

Stephen R. Leffler, Law Office of Stephen R. Leffler, Memphis, TN, for Defendant–Appellant.

BEFORE: BATCHELDER and CLAY, Circuit Judges; and SCHWARZER,* District Judge.

BATCHELDER, Circuit Judge.

Appellants Jeffrey Phillips and Anthony Davis were both indicted for their involvement in an identity theft and credit fraud conspiracy. Davis pleaded guilty to counts of conspiracy, identity theft, mail fraud and money laundering, and Phillips pleaded guilty to conspiracy to commit identity theft. On appeal, Davis makes an oblique challenge to the manner in which the district court grouped his counts and calculated the amount of loss attributable to him for purposes of sentencing; Phillips objects to the manner in which the district court calculated the loss for which he was responsible, arguing that the district court should have used the Blue Book value of the automobiles he attempted to procure fraudulently rather than those vehicles' purchase prices. Because Davis's claim is waived, and if not, it is without merit, and because Phillips's claim is without merit, we AFFIRM the judgment of the district court.

## I

For approximately two years, from early 1999 to early 2001, Anthony Davis was the leader of a conspiracy to acquire, use and sell fraudulent credit information. Davis had access to databases containing credit records, social security numbers, addresses and employment histories, from which

---

* The Honorable William W. Schwarzer, District Judge, United States District Court for the Northern District of California, sitting by designation.

he would obtain the identities of individuals with good or no credit history and then sell those identities to persons with the same or similar names. He also financed the purchase of homes and cars, and obtained credit cards for himself using social security numbers he had stolen.

Phillips began working for Davis initially as a salesman in Davis's alarm/security business, and then worked in the same capacity in Davis's "credit repair" business. Phillips used social security numbers furnished him by Davis to procure loans for several automobiles, including a Cadillac Escalade that he attempted to purchase on credit for slightly more than $49,000.[1]

Davis was named in a 23–count Superseding Indictment that charged him, Phillips, and fifteen other individuals with conspiracy to commit identity theft in violation of 18 U.S.C. § 371, and identity theft in violation of 18 U.S.C. § 1028(a)(7). Davis was also charged in an information with mail fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341 and 2, and with laundering approximately $33,000 in violation of 18 U.S.C. § 1957. He pleaded guilty to all counts against him. In calculating his sentence under the Guidelines, the district court used the money laundering conviction as the base offense pursuant to USSG § 3D1.2—1.4 (2000), and, after determining that the amount of the loss attributable to Davis was more than $2 million–although Davis had only pleaded guilty to laundering $33,000–the court enhanced his offense level by six points pursuant to USSG § 2S1.1(b)(2) (providing penalties for money laundering).

Phillips pleaded guilty to conspiracy to commit identity theft. At sentencing, the district court applied a seven-point enhancement under USSG § 2F1.1(b)(1) for causing a loss in the range of $120,000 to $200,000. In calculating the amount of loss, the district court relied upon the sale price of the vehicles Phillips obtained with fraudulent loans rather than what Phillips would have received had he resold the vehicles immediately after driving them off the dealerships' lots.

These timely appeals followed.

## II

### A. Davis's appeal from his sentencing

Davis's argument on appeal is not entirely clear.[2] Construed generously, Davis's brief claims that the district court could have either (1) sentenced him using the money laundering count as the basis for his offense level, but held him responsible for only the $33,259 that he admitted to laundering, or (2) held him responsible for a loss of over $2 million, but only in connection with fraud and not money laundering. The court should not, Davis argues, have used the base offense of money laundering and then enhanced that offense by attributing amounts of loss to Davis on the basis of money he claims he did not launder. As a matter of statutory interpretation, Davis argues, money laundering

---

**1.** The automobile dealer stopped the transaction after he noted discrepancies between the information that Phillips gave him to obtain financing for the Escalade and information on the credit report that he ran using Phillips's supposed social security number.

**2.** For instance, he writes, "[h]ad the district court properly calculated and grouped the counts the Defendant's resulting offense level for the identity theft and fraud offenses would have been higher [sic] than that for the money laundering offense." Davis Br. at 17. However, in his reply brief, Davis states that he "does not quarrel with the grouping method used or the use of the money laundering guidelines. What he quarrels with is the calculation of the funds laundered under the money laundering guideline...." Davis Reply Br. at 1.

does not include the underlying offense of identity theft, and the money that Davis obtained in this case did not constitute "criminally derived property" until it came under his control.

■ While the challenges Davis raised before the district court appear from the record to have been no clearer than the arguments he makes to this court, we are inclined to think that Davis has waived this claim. Even though Davis argued in his written objection to the presentence report that he was being held criminally responsible for more money than he laundered and that the money laundering statute did not apply to his fraudulent activities, at the sentencing hearing he contended only that "it's our judgment or position that this is not a heartland case." Nonetheless, the district court addressed Davis's written objection that money laundering did not apply to all of the transactions in the case, and characterized the objection as a request for a downward departure rather than a request that the court sentence him under a different guideline provision. Davis's lawyer explicitly accepted the district court's "downward departure analysis." By admitting to the judge that the issue had been resolved, and by failing to renew his objection during the sentencing hearing, Davis abandoned his objection. *See United States v. Saucedo,* 226 F.3d 782, 787 & n. 7 (6th Cir.2000).

■ Even if Davis did not abandon this claim, it is without merit. To the extent that Davis is challenging his sentence on the ground that fraud cases are outside of the heartland of the money laundering provision of the Guidelines, his contention is governed by *United States v. Lewis,* 296 F.3d 487 (6th Cir.2002), in which we rejected the defendant's claim "that the elements of money laundering present in the scheme for which he was convicted were incidental to what was basically a pattern

of fraud," *id.* at 492, and held that fraud cases are not outside of the heartland of money laundering convictions. *Id.* at 494–95.

■ To the extent that Davis claims that procuring goods through the use of fraudulently obtained loans and credit does not violate the federal prohibition against money laundering found in 18 U.S.C. § 1957, his claim is refuted by the clear language of the statute. Section 1957 brings within its purview "[w]hoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). "[T]he term 'monetary transaction' means the deposit, withdrawal, transfer, or exchange, ... of funds or a monetary instrument ... by, through, or to a financial institution...." 18 U.S.C. § 1957(f)(1). A "financial institution" includes, among other entities, a bank, credit union, an insurance company, a loan or finance company, and a business involved in automobile sales. 31 U.S.C. § 5312(a)(2).

Davis argues that "[t]he identity theft and fraud must produce proceeds before anyone can launder those proceeds, and these proceeds must have been produced in acts distinct from the conduct that constitutes money laundering. The defendant did not obtain the proceeds of the identity theft and fraud until after the bank transfers." Davis Br. at 11 (internal quotations omitted). This argument is unavailing. Davis essentially asks us to collapse two distinct steps in a transaction–obtaining loan financing and purchasing a vehicle–in order to find that the vehicle, and not the loan, constituted the "proceeds" of his fraud. His request has no basis in law or common practice. Automobile financing comes from a "financial institution," whether it be a bank, credit agency, or the financing arm of a dealership or car manu-

facturer. Davis used false information to obtain loans from those financial institutions. Even if he never held the money in his hand, that money, or "proceeds," was nonetheless "exchanged" at his bidding for the vehicles and other purchases. In fact, the funds in many secured transactions are never under the direct control of the buyer, but often go directly from the lender to the seller. Section 1957 clearly applies to such transactions.

## B. Phillip's appeal from his sentencing

Phillips argues that the district court should have based the amount of loss attributable to him on the cost of the property to the victim–in this case, the car dealership–as opposed to the retail price of that property. We review for clear error the district court's determination of the amount of loss attributable to a defendant for purposes of assigning an offense level under the Guidelines. *United States v. Abdullah,* 162 F.3d 897, 906 (6th Cir.1998). However, the meaning of "loss" is a question we review de novo. *United States v. Holiusa,* 13 F.3d 1043, 1045 (7th Cir.1994). Phillips cannot prevail under either standard.

Phillips urges the court to adopt a particular means of valuing an automobile, namely, the Blue Book value of the car or what Phillips could have received for the car once he had driven it off the dealer's lot. USSG § 2F1.1, comment. (n.8(b)), states that "[i]n fraudulent loan application cases ..., the loss is the actual loss to the victim.... However, where the intended loss is greater than the actual loss, the intended loss is to be used." We do not think that the district court erred in holding that the amount lost by the dealerships was the agreed purchase price of the vehicle. Had Phillips not obtained the vehicles, someone else would have bought them for a price similar to that which Phillips agreed to pay (assuming competitive prices at the dealership), and, there-

fore, Phillips's actions caused the dealerships to lose legitimate sales. Moreover, the Blue Book value of the cars, or what Phillips could receive for them immediately after he had driven them off the lot, may not account for the costs incurred by the dealership, such as sales, overhead, and inventory costs.

The Guidelines state that " '[l]oss' means the value of the property taken.... Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue." USSG § 2B1.1, comment. (n.2). Even if the Blue Book values a car at a lesser amount than the price charged by the dealership, the price obtained by the dealership when it sells a car is, definitionally, its market value. The Blue Book and similar publications do not *determine* value, but *report* value across the market as a whole. In a functioning free market, value is determined by the interplay of supply and demand, and that interplay leads to different values in different places at different times for similar items. There is no better way to determine the value of a vehicle from a given auto dealer at a given point in time than the sale price agreed upon by buyer and seller. Neither the fact that Phillips declined to negotiate with the dealer for a lower price–because Phillips feared negotiation might lead to the discovery of his fraudulent activity–nor the fact that Phillips never actually intended to pay the agreed price ought now to redound to his benefit. And finally, of course, Phillips fraudulently procured loans based on the agreed sales price of those vehicles.

### III

For the foregoing reasons, we AFFIRM the judgment of the district court.