*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0414p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

  *v.*

DONALD HYNES,

  *Defendant-Appellant.*

No. 05-2036

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-80889—John Corbett O'Meara, District Judge.

Argued: September 19, 2006

Decided and Filed: November 7, 2006

Before: CLAY and GILMAN, Circuit Judges; OBERDORFER, District Judge.[*]

———————

**COUNSEL**

**ARGUED:** Elizabeth L. Jacobs, Detroit, Michigan, for Appellant. Sarah Resnick Cohen, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Elizabeth L. Jacobs, Detroit, Michigan, for Appellant. Sarah Resnick Cohen, Jonathan Tukel, UNITED STATES ATTORNEYS, Detroit, Michigan, for Appellee.

———————

**OPINION**

———————

RONALD LEE GILMAN, Circuit Judge. Donald Hynes, a former Detroit police officer, appeals his convictions on six counts arising from a scheme to remove seized drugs from the Evidence and Property Room at the Detroit Police Department and sell those drugs for profit. Hynes argues that (1) remarks and conduct by the district judge deprived him of his right to a fair trial, (2) the government's proof at trial so varied from the indictment that it violated his constitutional rights, (3) the evidence introduced by the government was insufficient to support the jury's verdict on three of the counts, and (4) his attorney rendered constitutionally ineffective assistance. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

———————

[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

# I. BACKGROUND

## A.    Factual background

Donald Hynes worked as a police officer in the Detroit Police Department's Evidence and Property Room (subsequently referred to simply as the Property Room), the repository where many of the items seized by the police are stored. Among those items were large quantities of cocaine that Lieutenant Arthur McNamara had seized during a series of drug raids in the 1990s. In 2001, McNamara went to the Property Room to secure a portion of this cocaine that he wanted to use in a reverse sting—an operation in which police officers pose as drug dealers. He was looking specifically for 30 kilograms of cocaine that he had previously seized from Andres Colmines and 10 kilograms of cocaine taken from William Quazada. After neither cache of drugs could be located, McNamara notified the department's Internal Affairs Section, which launched an audit and investigation in conjunction with the FBI.

The investigation revealed that 101 kilograms of cocaine were missing from the Property Room, along with approximately 10,000 other pieces of evidence. One of the packages examined during the investigation was labeled as "cocaine," but was discovered to contain bags of flour manufactured years after the cocaine supposedly in that package had been seized. Investigators therefore concluded that someone had taken the cocaine long after its seizure and replaced it with bags of flour. This information, along with a tip from a witness, led law enforcement officials to suspect that the person responsible for this substitution was John Cole, Sr., a former civilian employee in the Property Room. Cole, in turn, implicated Hynes and Anthony Lasenby. The latter was a nephew of Cole's who allegedly sold the drugs that Cole and Hynes took from the Property Room.

According to his testimony at trial, Cole enlisted Hynes's help out of fear that others would become suspicious of the frequent presence of a civilian employee in the narcotics vault of the Property Room. Cole did not know how Hynes went about selecting the particular drugs that would be stolen, but remembered that the name of Lieutenant McNamara appeared on most of the packages. McNamara confirmed that he had given Hynes his password to the department computer so that Hynes could update the status of the evidence. Printouts from the department computer likewise indicate that someone had changed the status of three cocaine seizures by McNamara—constituting 2, 10, and 31 kilograms in quantity, respectively—from "Live" to "To be destroyed." This change in status was designed to explain the absence of the drugs, which others would assume had already been destroyed.

The police also conducted a search of Cole's residence in Detroit, uncovering banking and real estate records, as well as personal papers. Those records and papers included Hynes's name, telephone number, and a carbon copy of a cashier's check that came to play a significant role in the police investigation. The cashier's check, which had been used by Cole to purchase a barbershop in his son's name, stated on the remitter line that it had been drawn on funds belonging to William Hynes, the defendant's father. William Hynes later confirmed that he had purchased the check at his son's direction, and further investigation revealed that the funds used to purchase the check came from cash deposited into William Hynes's account in two increments of $9,000 each and one increment of $6,000 in the days proceeding the transaction. Although Cole testified that this was the precise manner in which Hynes had told him that the cashier's check would be secured, Hynes later told the grand jury that he did not know anything about a cashier's check drawn by his father being used to purchase the barbershop.

In studying Hynes's finances, agents from the Internal Revenue Service (IRS) also noticed suspicious discrepancies between the salaries earned by Hynes and his wife and their spending habits. The Hyneses' expenditures between 1998 and 2001 greatly exceeded their income, and

account records revealed unexplained cash deposits totaling $129,910 between October of 1997 and April of 2001.

## B.     Procedural background

The third superseding indictment charged Hynes with (1) conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II), and 846; (2) distribution of five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II); (3) conspiracy to steal or embezzle property under the care or custody of the Detroit Police Department that was valued at $5,000 or more, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 371; (4) embezzlement or theft of property under the care of the Detroit Police Department that was valued at $5,000 or more, in violation of 18 U.S.C. § 666(a)(1)(A); (5) conspiracy to launder money, in violation of 18 U.S.C. § 1956(h); and (6) making a false declaration to a grand jury, in violation of 18 U.S.C. § 1623(a).

During the four-day trial, the government introduced testimony from Hynes's alleged coconspirators, Cole and Lasenby, as well as from various law enforcement officials involved in the investigation. The jury deliberated for two days before returning a verdict of guilty on all counts. Hynes then filed a motion for a new trial, arguing that (1) the evidence introduced at trial had constructively amended and/or impermissibly varied from the indictment with respect to Counts V and VI, (2) the evidence was insufficient to support the jury verdict on Counts III, IV, and VI, (3) defense counsel had rendered constitutionally ineffective assistance, and (4) the jury's verdicts on Counts I, II, III, and IV were against the great weight of the evidence. The district court, after finding no merit to any of these claims, denied Hynes's motion. This timely appeal followed.

## II. ANALYSIS

## A.     The district court did not exhibit impermissible bias or otherwise deprive Hynes of his right to a fair trial

Hynes's contention that the district court deprived him of his right to a fair trial has three components. He argues that (1) a comment by the district judge prior to voir dire denied him the presumption of innocence, (2) the judge's interventions during trial interfered with the presentation of his defense and violated the Confrontation Clause, and (3) the court's criticism of defense counsel rose to the level of impermissible judicial bias. These arguments will be addressed in turn.

### 1.     *Presumption of innocence*

After the district court had read the indictment and just prior to commencing voir dire, it made the following statement to the prospective jurors: "Now, a criminal defendant who does not acknowledge his culpability must be tried and found to be guilty or not guilty." Hynes contends that "this statement alone . . . extinguished the presumption of innocence and put in its place a finding of guilt." We respectfully disagree. The statement, especially when considered in its context, did nothing of the kind. At the time, the district court was explaining to potential jurors the essential role of the jury in the criminal justice system and was preparing them for the types of questions that they would be asked during voir dire. Neither the statement cited by Hynes nor the remainder of the judge's introductory comments indicates "that the judge had found or thought that the defendant was guilty," as Hynes contends, or that Hynes, rather than the government, bore the burden of proving the charges against him. The district court's statement, in other words, was not in any way improper.

But even if the isolated statement could be interpreted as improper, the district court avoided any prejudice to Hynes by twice instructing the jury on the presumption of innocence. In its preliminary instructions to the jury, the district court stated:

> Three things are more important than anything else in your consideration . . . of the facts and doing your job here. First of all, the Defendant is presumed to be innocent unless proven guilty. The indictment against the Defendant is only an accusation, nothing more. It's not proof of guilt or anything else. The Defendant starts out with a clean slate.
>
> Second, the burden of proof is on the Government throughout. Defendant has no burden to prove his innocence or to present any evidence or to testify. Since the Defendant has the right to remain silent, the law prohibits you from considering the fact that the Defendant may not have testified in arriving at your verdict. And, third, the Government must prove the Defendant's guilty beyond a reasonable doubt.

The district court not only correctly instructed the jury as to the presumption of innocence, but also highlighted the crucial nature of that principle by labeling it "more important than anything else" that the jury would consider.

After closing arguments, the district court again returned to the presumption of innocence and the heavy burden of proof placed on the government. The court read verbatim the explanation of the presumption of innocence, the government's burden of proof, and the reasonable-doubt standard included in Sixth Circuit Pattern Jury Instruction 1.03 (1991 and 2005 editions) and approved by this court in *United States v. Sillman*, No. 91-1130, 1992 WL 146654, at *1 (6th Cir. June 26, 1992) (per curiam) (unpublished). Because jurors are presumed to follow the trial court's instructions, *see United States v. Newsom*, 452 F.3d 593, 604 (6th Cir. 2006), any possible confusion caused by the district court's solitary statement prior to voir dire was alleviated by the two consistent and correct instructions subsequently given to the jury.

Finally, to the extent that the district court's initial statement can be construed as a jury instruction, Hynes waived any challenge by failing to lodge a contemporaneous objection. *See United States v. Anderson*, 76 F.3d 685, 689 (6th Cir. 1996). In the absence of such an objection, we review the challenged instruction under the plain-error standard. *See id.* But as explained above, the district court committed no error, plain or otherwise. We therefore conclude that Hynes's argument that the district court diluted the presumption of innocence is without merit.

### 2.     *The judge's interventions during trial*

Hynes next contends that the district judge deprived him of his right to a fair trial by repeatedly interrupting defense counsel's attempts to cross-examine government witnesses and to present evidence. We generally review a district court's conduct during trial under the abuse-of-discretion standard. *McMillan v. Castro*, 405 F.3d 405, 409 (6th Cir. 2005). But where the defendant does not contemporaneously object to the trial court's conduct, we review that conduct under the plain-error standard. *United States v. Owens*, 159 F.3d 221, 227 (6th Cir. 1998). This court has implied, however, that the heightened plain-error standard might not apply to defaulted objections if raising a contemporaneous objection "would have exacerbated the situation." *See United States v. Sims*, 46 F. App'x 807, 814 (6th Cir. Sept. 6, 2002) (unpublished) ("Because defense counsel did not object to the district court's remarks at trial and [the defendant] does not argue that to do so would have exacerbated the situation, we review for plain error.") (quotation marks omitted). In the present case, although Hynes did not object to any of the alleged examples of improper conduct that he now raises on appeal, he argues that doing so "would only have exacerbated the problem."

Regardless of which standard of review is applicable in the present case, we conclude that the district court did not err in occasionally interrupting the proceedings to clarify the law or the facts, require precise questioning from defense counsel, or speed the trial along. This court has recognized that the judge in a criminal trial "is more than a mere arbitrator to rule upon objections

and to instruct the jury." *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979) (citation omitted). Rather, the trial court has the responsibility of assuring "that the issues are not obscured and that the testimony is not misunderstood." *Id.* The court may therefore "interject itself into the proceedings when 'necessary to clear up confusion in the evidence or to supplement, in an impartial fashion, the presentation of a poorly prepared attorney.'" *McMillan*, 405 F.3d at 410 (quoting *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 808 (6th Cir. 1999)). Accordingly, "the threshold inquiry is whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the district court's conduct falls demonstrably outside this range so as to constitute hostility or bias." *Id.*

This court in *Hickman* – as one of the few cases in which a judge's conduct during trial has led to the reversal of a conviction – set forth three nonexhaustive factors to be considered in "determining when a trial judge oversteps." 592 F.2d at 933. The first factor, "the nature of the issues at trial," focuses on whether a trial is "lengthy" or "complex," which might require the judge's intervention "to clarify what is going on." *See id.* Second, the *Hickman* court looked to "the conduct of counsel," emphasizing that, where attorneys "are unprepared or obstreperous" or "the facts are becoming muddled," the district judge "performs an important duty by interposing clarificatory comments or questions." *Id.* The third factor is the conduct of witnesses, whose "inadvertent" confusion may be "clear[ed] up" by "judicial intervention." *Id.* None of these factors supports the argument that the district court's conduct in the present case "rendered a fair verdict impossible." *Id.* at 932.

Hynes points to a series of occasions where the district judge interrupted defense counsel to ask him to clarify his questions, to avoid an argumentative tone with a witness, to proceed to a different topic because the one in question had been exhausted, and to seek out a stipulation as to undisputed facts. The conduct to which Hynes objects, however, falls well within the range of "acceptable, though not necessarily model, judicial behavior." *See McMillan*, 405 F.3d at 410. For example, the district court interrupted a detailed line of questioning about the alarm system used in the Property Room, questions that counsel was asking in an effort to demonstrate that Cole did not in fact need an accomplice and that his alleged reason for involving Hynes in the conspiracy was therefore false. At a sidebar conference, the judge sought to clarify the theory behind the questions, telling defense counsel to "ask questions that go directly to the issue whether it was necessary or appropriate or useful for [Cole] to get your client involved." The court then permitted counsel to continue that line of inquiry.

Other instances cited by Hynes involve conduct that, even if not exemplary, did not short-circuit the defense strategy or evince favoritism toward the government. When government witness Lasenby gave an unresponsive answer, defense counsel replied: "I know. You just said that a couple times. But was it after a ten kilo deal?" The district judge then told counsel: "Don't argue with him. Go ahead." Counsel repeated the question and continued the cross-examination of Lasenby. Although defense counsel's tone with the witness may not have been the "obstreperous" one identified by this court in *Hickman*, 592 F.2d at 933, the district court did not act impermissibly in advising counsel to avoid an argumentative stance and in permitting counsel to repeat the question.

The remaining examples identified by Hynes generally center on the district court's efforts to expedite the presentation of undisputed facts and to avoid repetitive questioning. On at least two occasions, for instance, the district court interrupted cross-examination by defense counsel to suggest that the government stipulate to certain facts and/or the identity of specific pieces of evidence. The first of these incidents occurred during the cross-examination of FBI Agent Michael Lubisco, testimony that Hynes argues "was extraordinarily important to the defense theory that Cole was lying." But the court's momentary interruption did not prevent the defense from eliciting from the witness the information that counsel sought, both by the witness's response to questions and by

a stipulation that the government agreed to make. Indeed, once defense counsel explained that he needed to continue his questions because an across-the-board stipulation would "mislead the jury," the district judge allowed him to proceed.

The same is true of the second incident identified by Hynes, where the district court encouraged the government to stipulate to information about Hynes's pension—a stipulation with which defense counsel declared himself "satisfied." In spite of these and other interventions highlighted by Hynes, the information that defense counsel intended to introduce was presented to the jury in a coherent fashion. *See United States v. Gray*, 105 F.3d 956, 964-65 (5th Cir. 1997) (finding no reversible error where the district court's interventions "sometimes broke the flow of the defense presentation," but "[t]he relevant facts were brought to the jury's attention, and the defendants' counsel were able to interpret the facts favorably to their clients during closing argument").

Moreover, the district court's conduct was a far cry from the actions found to be reversible error in *Hickman*. The trial judge in *Hickman*, in the course of a one-day trial, conducted a redirect examination of a government witness following cross-examination, cross-examined defense witnesses after the government had already done so, expressed "contemptuous disbelief" toward the final defense witness, and cut off defense counsel during closing argument. 592 F.2d at 935-36. This court concluded that the district judge's "anti-defendant" demeanor was "strongly inferable" from all of these actions, and that the judge's conduct "must have left the jury with a strong impression of the judge's belief of the defendant's probable guilt." *Id.* at 936.

Here, in contrast, the district judge presided over four days of testimony and argument, interrupting defense counsel only occasionally and never questioning a witness directly. The present case is therefore closer to the facts in *United States v. Frazier*, 584 F.2d 790, 793-94 (6th Cir. 1978), a case that the *Hickman* court distinguished as one in which "[t]he trial judge did not examine any of the witnesses and interrupted examination by counsel only on several occasions." *See* 592 F.2d at 936 n.5. As the *Frazier* court cautioned in rejecting the defendant's claims, "[w]e must guard against the magnification on appeal of instances which were of little importance in their setting." 584 F.2d at 794. In sum, Hynes's "substantial rights . . . were not affected" by the trial judge's conduct. *Id.*

One last aspect of Hynes's second argument warrants our attention. Hynes contends that the judge's interruptions during the cross-examination of government witnesses violated his rights under the Sixth Amendment's Confrontation Clause. Although the Confrontation Clause generally protects a defendant's right to cross-examine the witnesses against him, *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974), the Supreme Court has recognized that "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The Court has thus explained that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original).

Hynes had ample "opportunity" to cross-examine the witnesses against him and exercised that opportunity at length. *See id.* The record shows that the district court limited cross-examination solely to avoid "confusion of the issues . . . or interrogation that is repetitive or only marginally relevant." *See Van Arshall*, 475 U.S. at 679. Those limitations were reasonable and fall well within the "wide latitude" that trial courts are to be accorded. *See id.* Hynes's argument that the district court's conduct violated his rights under the Confrontation Clause therefore lacks merit.

### 3.        *Treatment of defense counsel*

In his final challenge to the conduct of the district judge, Hynes argues that the judge demonstrated impermissible bias when he allegedly "belittled and derided" defense counsel. Hynes points to a handful of incidents in the record, most of which involve the judge's efforts to speed up the trial and one of which criticized lawyers in general, with a more specific reference to "the Government as well as [defense counsel]." None of these incidents, however, rises to the level of impermissible judicial bias. The Supreme Court has made clear that "expressions of impatience, dissatisfaction, annoyance, and even anger" do not constitute bias or partiality. *Liteky v. United States*, 510 U.S. 540, 555-56 (1994). Moreover, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555. Hynes's argument that the overruling of one of his objections demonstrates bias is therefore misplaced.

This court's decision in *United States v. Tipton*, 11 F.3d 602 (6th Cir. 1993), which Hynes struggles to distinguish, is directly on point. The trial judge in *Tipton* made "ten allegedly objectionable comments," including one that this court labeled "an unfortunate and inappropriate put-down of defense counsel," and others in which the judge used an inappropriate tone and engaged in an improper "display of impatience." *Id.* at 611-12. Although acknowledging that "some of the judge's comments [and] admonishments were inappropriate" and that "they undermined defense counsel's credibility to some small degree," this court held that the comments did "not amount to plain error." *Id.* at 612-13. In the present case, we likewise conclude that the district court's conduct, although it may not have been ideal, did not result in "any real prejudice" to Hynes. *Id.* at 612. The comments cited by Hynes are arguably not even inappropriate and, to whatever extent they may have been, did not "undermine[] defense counsel's credibility" or interfere with Hynes's defense in any material way. *See id.* at 613.

Finally, even if we assume for the sake of argument that the district court's comments during trial were improper, the court twice instructed the jury that its rulings were not to be interpreted "as any indication of how I think the case should be decided." This court has recognized that "curative instructions at the close of the proceedings" are a factor to be evaluated in determining whether inappropriate comments rise to the level of reversible error. *See McMillan*, 405 F.3d at 410; *see also Tipton*, 11 F.3d at 612. In the present case, as in a recent unpublished decision, "[a]ny negative impact on the jury was mitigated by several jury instructions informing them that any comments made by the district court should not influence their determination of guilt or innocence." *See United States v. Johnson*, 182 F. App'x 423, 434 (6th Cir. May 10, 2006) (unpublished).

**B.        Evidence offered by the government did not constitute a constructive amendment and did not result in a prejudicial variance**

Hynes next argues that the evidence introduced by the government with respect to Count V (conspiracy to launder money) and Count VI (false declaration before a grand jury) so diverged from the charges set forth in the indictment as to violate his rights under the Fifth and Sixth Amendments. An indictment by a grand jury, which is itself a right guaranteed by the Constitution in federal prosecutions, also protects two other constitutional rights—the Sixth Amendment right to fair notice of the criminal charges against a defendant and the Fifth Amendment's "protection[] against twice placing a defendant in jeopardy for the same offense." *United States v. Combs*, 369 F.3d 925, 935 (6th Cir. 2004). We review de novo whether there was an amendment to or variance from the indictment. *United States v. Prince*, 214 F.3d 740, 756 (6th Cir. 2000).

Three classes of modifications to indictments have been recognized by this court: a variance, an amendment, and a third category lying between the other two—a constructive amendment. These concepts—variances and constructive amendments in particular—are closely related. A variance "occur[s] when the charging terms of an indictment are left unaltered, but the evidence offered at

trial proves facts materially different from those alleged in the indictment." *Combs*, 369 F.3d at 935-36 (citation and quotation marks omitted).  Constructive amendments, in contrast, "are variances occurring when an indictment's terms are effectively altered by the presentation of evidence and jury instructions that so modify essential elements of the offense charged that there is a substantial likelihood the defendant [was] convicted of an offense other than that charged in the indictment." *Id.* at 936 (citation and quotation marks omitted) (alteration in original).  The burden of proving that a variance has occurred and that the variance rises to the level of a constructive amendment is on the defendant.  *United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002).

There are two key differences between these categories.  The first is that, although "the distinction between a variance and a constructive amendment is sketchy, the consequences of each are significantly different."  *See id.*  Specifically, constructive amendments are deemed "per se prejudicial" because they "infringe[] upon the Fifth Amendment's grand jury guarantee."  *Id.*  A defendant who proves a constructive amendment is thus entitled to a reversal of his or her conviction, whereas a defendant who establishes only that a variance has occurred must further demonstrate that his or her substantial rights have been affected.  *See id.*; *Combs*, 369 F.3d at 935-36.  In this context, "[s]ubstantial rights are affected only when a defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions."  *United States v. Barrow*, 118 F.3d 482, 488-89 (6th Cir. 1997) (citation and quotation marks omitted).

The second key difference is that a defendant can prove a constructive amendment only by pointing to a combination of evidence *and* jury instructions that effectively alters the terms of the indictment and modifies the essential elements of the charged offense to the extent that the defendant may well have been convicted of a crime other than the one set forth in the indictment.  *United States v. Suarez*, 263 F.3d 468, 478 (6th Cir. 2001) (explaining that this court's test for finding a constructive amendment requires "a variance between indictment and jury instructions"); *see also Combs*, 369 F.3d at 936 (referring to "the presentation of evidence and jury instructions" that effectively modifies the terms of the indictment); *Chilingirian*, 280 F.3d at 712 (same).  In other words, defendants can establish a variance by referring exclusively to the evidence presented at trial, but cannot demonstrate a constructive amendment—which is per se prejudicial—without proof that the important functions of an indictment were undermined by both the evidence presented *and* the jury instructions.  *Suarez*, 263 F.3d at 478.

With these definitions in mind, we now turn to Hynes's challenges.  Hynes argues that (1) the government's presentation of evidence relating to a transaction not listed in the indictment constituted a constructive amendment to and/or variance from the charge that he conspired to launder money, and (2) the government's focus during closing arguments on a second allegedly false statement by Hynes before the grand jury constructively amended and/or varied from the false-declaration offense charged in the indictment.  These arguments will be addressed in turn.

### 1.     *Count V:  conspiracy to launder money*

The indictment charged that Hynes conspired with John Cole and other unnamed persons to launder money between approximately September of 1994 and April of 2002.  Listed under the heading "Overt Acts" were eight actions that one or more of the conspirators took during the specified period, including transactions related to two properties in Detroit—one located at 19430 Van Dyke and the other at 18949 Hoover.  At trial, however, the government presented evidence that a third piece of property, the defendant's home in Troy, Michigan, had also been purchased with proceeds from his criminal activities.  The government called IRS Agent Martin Sviland to testify that Hynes had carried out a series of transactions to make it appear that the $41,000 down payment for his home came from his parents, when in fact that money had just been given to his parents by Hynes himself.  This third transaction was specifically mentioned by the government during its

closing argument. Hynes argues that this additional evidence, when combined with the absence of a specific unanimity instruction to the jury, amounted to a constructive amendment or, at a minimum, to a prejudicial variance.

In evaluating whether the government's introduction of evidence of an additional overt act in furtherance of the conspiracy constructively amended Count V of the indictment, two of this court's decisions are particularly instructive. In one, *United States v. Rashid*, 274 F.3d 407, 411 (6th Cir. 2001), the defendants were brothers who used fake contracts with established companies to convince friends and acquaintances to invest in what the brothers described as "revolutionary" radar technology. *Id*. at 411. The government charged the brothers with conspiring to launder money, identifying a fraudulent investment scheme that ran from May of 1988 to April of 1997. *Id.* at 414. In describing the overt acts required for a conviction under the general conspiracy statute (18 U.S.C. § 371), the indictment focused on the brothers' interaction with potential investors beginning in 1992. *Id.* At trial, however, the government presented evidence related to the Rashids' efforts to lure a group of investors in 1988. *Id.* at 413.

The *Rashid* court rejected the argument that the discrepancy between the indictment and the proof offered at trial constituted either a constructive amendment or a variance. Two facts were at the heart of the court's analysis. The first was that the reference in the indictment to investors courted by the brothers during the 1990s used the language "including, but not limited to," meaning that the list of investors targeted was not exhaustive. *Id.* at 414. Second, the court emphasized that the 1988 dealings, although not mentioned in the part of the indictment highlighted by defense counsel, fell within the period of the conspiracy alleged in the indictment, which stretched from 1988 to 1997. *Id.* at 414. The court thus distinguished a prior precedent in which the government had alleged possession of a firearm on a specific date, but where the district court was held to have erred in permitting the jury to consider evidence that the defendant possessed the firearm on a different date. *Id.* (citing *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989)).

Both of the points emphasized by the *Rashid* court cut against Hynes. As to the first, the jury in the present case was instructed, consistent with the indictment, that "one or more of the conspirators committed the following overt acts." Although not as clear as the "including, but not limited to" language at issue in *Rashid*, this instruction neither stated nor implied that the overt acts included in the indictment comprised an exhaustive list or that the jury must unanimously agree that one of the listed acts occurred in order to convict. Second, and more important, the third transaction discussed by the government during the testimony of Agent Sviland and during closing arguments fell well within the period set forth in the indictment. That period stretched from 1994 to 2002, and Hynes purchased the Troy property in 1999. Just as in *Rashid*, the jury instructions here explicitly set forth the relevant start and end dates of the conspiracy, and the additional evidence related to conduct occurring within that period. Consequently, the jury did not convict Hynes based on acts that occurred outside of the time period alleged in the indictment.

The second key case decided by this court is *United States v. Prince*, 214 F.3d 740 (6th Cir. 2000). In *Prince*, another money-laundering case, the defendant argued that a constructive amendment and/or variance had occurred where the government introduced testimony that the defendants had carried out certain transactions not just to conceal the source of their funds, but also to avoid transaction-reporting requirements. *Id.* at 753-56. The jury instructions included a phrase that would have permitted conviction under this latter theory, even though it corresponded to a separate section of the statute not charged in the indictment. *Id*. at 756. This court nonetheless rejected the defendant's challenge, explaining that the existence of a constructive amendment turned on whether the additional evidence and instructions presented the jury with another crime or were "merely two alternative methods by which the one crime . . . could have been committed." *Id.* at 758; *see also Suarez*, 263 F.3d at 478 (explaining the analysis in *Prince*). Because the testimony and jury instruction cited by Prince "provided an alternative method" of proving the single offense

of money laundering, there was no constructive amendment, and any variance did not prejudice him. 214 F.3d at 758-59.

Similarly, in the present case, the evidence of a third property transaction constituted, at most, an "alternative method" of proving the single crime alleged in Count V—conspiracy to launder money. *See id.* at 758. Furthermore, evidence of an additional act not alleged in the indictment would help the government satisfy its burden of proof only if the government actually had to prove that one of the conspirators committed an overt act. But it did not, as the Supreme Court unanimously confirmed in 2005. *See Whitfield v. United States*, 543 U.S. 209, 211 (2005) (holding that a conviction for conspiring to launder money under 18 U.S.C. § 1956(h) does not require proof of an overt act). All that the government had to prove, therefore, is that Hynes agreed with another person to violate the substantive provisions of the money-laundering statute during the period alleged in the indictment. The evidence relating to the Troy property did nothing more than that. For these reasons, Hynes has not shown that the evidence presented by the government and the instructions given to the jury amounted to a constructive amendment of the offense charged in Count V.

We next turn to the question of whether the evidence of the third property transaction constituted a variance. A variance requires reversal of a conviction "only when a defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *Barrow*, 118 F.3d at 488-89 (citation and quotation marks omitted). Hynes has not shown any of these factors. He had the opportunity to cross-examine Agent Sviland and to respond to the government's evidence regarding the Troy property during closing arguments. *See Prince*, 214 F.3d at 759 (citing the defendant's "motive and opportunity to rebut" the additional evidence in concluding that this evidence did not undermine the fairness of the trial).

Furthermore, the inclusion of the third transaction raises no possibility that Hynes could later be prosecuted for the same conspiracy offense, since the Troy transaction occurred during the period alleged in the indictment. *See id.* Because the alleged variance did not undermine the fairness of the trial or threaten his double jeopardy rights, Hynes has not suffered any prejudice. *See Combs*, 369 F.3d at 935 (emphasizing that where the constitutional rights at issue "are not threatened, rules governing indictments should not be applied in such a way as to defeat justice fairly administered") (citation and quotation marks omitted). We thus have no need to further explore the question of whether the evidence of the third property transaction actually constituted a variance.

### 2.        *Count VI:  false declaration before a grand jury*

Hynes's constructive-amendment and variance arguments as to Count VI are more easily resolved. In short, Hynes maintains that the government's contention during its closing argument that he had given a second false statement before the grand jury permitted the jury to convict him based on that second statement, not on the one alleged in the indictment. The second statement at issue arose from the following exchange during Hynes's grand jury testimony:

Q. What can you tell us about the barber shop?
A. Well, my understanding is that—I believe that John [Cole, Sr.] is a silent partner or owns it. He has some financial interest in it because his son runs it or works there or something.
Q. So you thought John, Sr. was a silent partner?
A. In my opinion, that was my impression.

During its closing argument, the government referred specifically to the quoted passage and insisted that Hynes knew that John Cole, Sr. was more than a silent partner in the barbershop and that his

responses were therefore false. This second false statement, the government argued, "shows that when [Hynes] testified falsely *as to the other issue* in the grand jury that that was no mistake." (Emphasis added.) (*See* Part II.C.2. below for a discussion of the "other issue" that is alleged in the indictment.)

But Hynes cannot establish a constructive amendment because the jury instructions correctly indicate that one—and only one—false statement is alleged in the indictment. *See Suarez*, 263 F.3d at 478. Specifically, the district court read to the jury the colloquy excerpted in the indictment, correctly explaining that Hynes's final response, "No, today is the first time I heard that," was "underlined . . . marking it as the alleged falsehood." The fact that the jury actually had the indictment with the allegedly false statement underlined with it during deliberations further reduced any potential for confusion.

Finally, the government's isolated reference to a second false statement was not "evidence offered at trial [to] prove[] facts materially different from those alleged in the indictment." *Combs*, 369 F.3d at 935-36 (defining a variance). And even if Hynes had proven a variance, he nonetheless failed to establish any prejudice. Hynes had every opportunity during closing argument to refute the government's contention and to remind the jury that there was only one falsehood charged in the indictment. He has also failed to show that "the variance took him by surprise or placed him at risk of double jeopardy." *See Barrow*, 118 F.3d at 490 (assuming the existence of a variance, but finding no prejudice). Hynes's challenge to Count VI therefore fails.

## C.      The government introduced evidence sufficient to prove that Hynes conspired to steal police property worth at least $5,000, stole such property, and lied to the grand jury

Hynes further maintains that the evidence presented by the government was insufficient to support his convictions for (1) conspiring to steal and then stealing property valued at $5,000 or more, and (2) giving a false declaration before a grand jury. We review this challenge to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Johnson*, 440 F.3d 832, 839 (6th Cir. 2006) (citation and quotation marks omitted). Furthermore, "all reasonable inferences and credibility choices" must be made "in support of the jury's verdict." *Id.* (citation and quotation marks omitted).

### 1.      *Counts III and IV:  conspiracy to steal and theft of property*

Hynes was convicted of conspiring to steal and then stealing from the Detroit Police Department property valued at $5,000 or more, in violation of 18 U.S.C. §§ 371 and 666(a)(1)(A). Section 666(a)(1)(A) applies to any agent of a state or local government who "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts . . . property that (i) is valued at $5,000 or more, and (ii) . . . is under the care, custody, or control" of the state or local government. One element of this offense that the government must prove beyond a reasonable doubt is that the property stolen or embezzled by the defendant had a value of at least $5,000.

The district court instructed the jury, with no objection from Hynes, that it had to determine "whether any property had a value of $5,000 or more . . . [by] consider[ing] the market value of such business or property, whether or not buying or selling such property is itself illegal. The market value is the price which a willing buyer and a willing seller would accept to exchange such property, even if it's illegal to sell such property." Hynes now challenges this instruction, which authorized the jury to consider the value of the stolen cocaine on a "thieves' market." Because Hynes did not object to the jury instruction when given, we review the challenge under the plain-error standard. *See United States v. DeJohn*, 368 F.3d 533, 540 (6th Cir. 2004).

We conclude that the district court did not err either in its charge to the jury or in denying Hynes's post-verdict claim of insufficient evidence on Counts III and IV. As the government points out, the three circuits that have considered the question of whether market value can be determined from the prices paid in a thieves' market have all answered that question in the affirmative. *See United States v. Robie*, 166 F.3d 444, 451 (2d Cir. 1999); *United States v. Brookins*, 52 F.3d 615, 619 (7th Cir. 1995) (citing *United States v. Oberhardt*, 887 F.2d 790, 792 (7th Cir. 1989)); *United States v. DiGilio*, 538 F.2d 972, 979-81 (3d Cir. 1976). Moreover, this court has stated in dicta that the amount that the defendants expected to obtain "for the stolen goods on the thieves' market" constituted "circumstantial evidence [that] is admissible to prove the value of stolen goods." *United States v. Solimine*, 536 F.2d 703, 708 (6th Cir. 1975). These cases strongly suggest that the district court's instruction was proper, and in any event preclude the conclusion that the instruction is so clearly erroneous as to constitute plain error.

None of these authorities, however, specifically addresses the use of a thieves-market instruction in a prosecution under 18 U.S.C. § 666(a)(1)(A). The Second Circuit's ruling in *Robie* and the Third Circuit's ruling in *DiGilio* involved 18 U.S.C. § 641, whereas this court's decision in *Solimine* and that of the Seventh Circuit in *Brookins* both dealt with 18 U.S.C. § 659. These two statutes, respectively, assert federal jurisdiction over the theft or embezzlement of U.S. government property and the theft, embezzlement, or conversion of property transported in interstate or foreign commerce. Section 641, unlike §§ 659 and 666(a)(1)(A), includes a specific definition of the term "value," which "means face, par, or market value, or cost price, either wholesale or retail, whichever is greater." In interpreting the identical term "value" in § 659, the cases have looked to the definition contained in both § 641 and 18 U.S.C. § 2311, the latter provision containing definitions for terms used in the federal theft statutes. *See Brookins*, 52 F.3d at 619 (applying cases interpreting § 641 and § 2311 to § 659).

We find no reason to depart from this course of reasoning with respect to 18 U.S.C. § 666(a)(1)(A). Like § 659, § 666(a)(1)(A) does not define the manner in which the value of the stolen property is to be determined. The latter section does, however, use a variation of the term "value" ("is *valued* at $5,000 or more")—the very term employed in §§ 641 and 659 and defined in § 2311. Moreover, §§ 641, 659, and 666(a)(1)(A) are all larceny statutes in which a threshold amount is required either to establish federal jurisdiction (in the case of § 666(a)(1)(A)) or to increase punishment (in the cases of §§ 641 and 659). The Supreme Court has held that statutes containing similar language and having a similar underlying purpose should be interpreted consistently. *Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427, 428 (1972) (per curiam) (holding that two fee-shifting statutes should be interpreted consistently where they had similar language and "a common *raison d'etre*"). Hynes has offered no reason for us to disregard this rule of construction and no reason why the price in a thieves' market should not be used to determine the value of stolen goods under § 666(1)(A) when that is the measure of value used under similarly worded statutes that criminalize analogous conduct.

Because we conclude that the thieves-market instruction was proper, there is sufficient evidence in the record to support Hynes's conviction on Counts III and IV. Coconspirator Lasenby testified on direct examination that the price of cocaine on the streets was approximately $20,000 per kilogram at the time that he first sold drugs supplied to him by Cole. Lasenby further testified that he eventually sold "between 95 and 110 kilos" of cocaine that Cole provided to him. Likewise, Police Lieutenant McNamara testified that the first thirty kilograms of cocaine that he identified as missing from the Property Room would have been worth approximately $750,000 on the wholesale market. From this testimony, the jury could easily have concluded that the sale of the first kilogram alone satisfied the $5,000 threshold. Because a rational juror could have found that the government has established all of the elements of Counts III and IV beyond a reasonable doubt, Hynes's insufficiency-of-the-evidence claim fails. *See Johnson*, 440 F.3d at 839.

### 2.        *Count VI:  false declaration to a grand jury*

Hynes also argues that the evidence presented by the government was insufficient to prove that he knowingly made a false material declaration before a grand jury.  *See* 18 U.S.C. § 1623(a) (making it a crime to knowingly make any false material declaration "in any proceeding before or ancillary to any court or grand jury of the United States").  Specifically, Hynes maintains that the question that he was found to have answered falsely was imprecise and/or ambiguous, and that he consequently could not have given an answer that he knew was false.  We agree with the government, however, that the question answered by Hynes, whether taken alone or considered in its context, was not ambiguous, and that Hynes's argument to the contrary fails under this court's decision in *United States v. DeZarn*, 157 F.3d 1042 (6th Cir. 1998).

In *DeZarn*, this court construed the perjury statute, 18 U.S.C. § 1621, which criminalizes willfully false, material statements.  *See* 157 F.3d at 1045 n.1.  The issue before the court in *DeZarn* was

> whether a person may be found guilty of perjury where he gives sworn testimony which, from the context of the questioning and circumstances surrounding the investigation, can reasonably be inferred to be knowingly untruthful and intentionally misleading, even though the specific question to which the response is given may itself be imprecise.

*Id.* at 1043.  After conducting a thorough review of the applicable law, the *DeZarn* court answered that question in the affirmative.  The court acknowledged that "[a] question that is truly ambiguous or which affirmatively misleads the testifier can never provide a basis for a finding of perjury," but emphasized that, "where it can be shown from the context of the question and the state of the testifier's knowledge at the time that the testifier clearly knew what the question meant, the Government must be permitted to present, and the fact-finder to consider, those contextual facts." *Id.* at 1049.  Because "the context in which the questions were asked made the object of the questioning clear" and revealed that DeZarn reasonably understood the questions posed to him, his perjury conviction was affirmed despite some imprecision in the questions.  *See id.*

Turning to the present case, Hynes's ambiguity argument fails under *DeZarn*.  The allegedly false declaration arose in the following context:

> Q.        The next page is Property Transfer Affidavit for that barber shop at 19430 Van Dyke.  You've seen these types of forms before, correct?
> A.        Yes.
> Q.        And it shows the purchase price and the date and who the purchase is, correct?
> A.        Yes.
> Q.        Purchaser is John [Cole], Jr.?
> A.        Okay.
> Q.        Now, the last page is a cashier's check from National City Bank and it says the remitter is William Hynes.  Who's William Hynes?
> A.        That's my father.
> Q.        And who's Joyce Hynes?
> A.        That's my mother.
> . . .
> Q.        This check, which was drawn by William Hynes, was used, according to the Adams Realty Records, to purchase that barber shop.  Do you know anything about how that came to be?
> A.        *No.  Today is the first time I heard that.*

(Emphasis added.) The italicized response is the one that the government charged was knowingly false.

Hynes insists that the final question was ambiguous because the government could have been seeking either (1) information about the source of the check, or (2) information about how the property at 19430 Van Dyke became a barbershop under the ownership of John Cole, Jr. We find this argument unpersuasive. The question asked, in relatively straightforward language, whether Hynes knew how a cashier's check drawn by William Hynes, his father, ended up being used to purchase a piece of property for John Cole, Jr. As the district court correctly concluded in denying Hynes's motion for a new trial, the question "unambiguously asked Hynes whether he knew about the origin of the check used to purchase a piece of property." His answer was direct and responsive, which eliminates the defense for literally true yet unresponsive answers that the Supreme Court recognized in *Bronston v. United States*, 409 U.S. 352, 362 (1973). Because Hynes's response was also sufficiently at odds with the other evidence introduced by the government, the jury was justified in concluding that Hynes "inten[ded] to testify falsely and, thereby, [to] mislead his interrogators." *See DeZarn*, 157 F.3d at 1049.

Furthermore, as in *DeZarn*, the context in which the question was asked erased any potential confusion caused by the wording of the inquiry. *See id.* The investigating officer from the Detroit Police Department had shown Hynes a carbon copy of the cashier's check just before his grand jury testimony, asking him whether he was familiar with the check. During Hynes's trial, immediately prior to the key question, the government pointed to the cashier's check and asked him who William Hynes was. The government then followed up the key question by asking Hynes whether he had ever introduced his father and mother to John Cole, Jr., the person who had used the cashier's check to purchase the property at issue. This series of questions was clearly aimed at demonstrating that Hynes was the key intermediary between his parents on the one hand (whom he testified had never been introduced to John Cole, Jr.) and the Cole family on the other.

When taken in context, therefore, Hynes was squarely asked whether he knew how his father came to obtain a cashier's check for $25,000 that John Cole, Jr. used to purchase a barber shop. A rational juror, relying on the testimony and the documentary evidence of Hynes's financial dealings as presented by the government, could have concluded beyond a reasonable doubt that Hynes did in fact know the origin of the cashier's check and that his declaration to the contrary was knowingly false. Accordingly, we reject Hynes's challenge to the sufficiency of the evidence supporting his conviction under 18 U.S.C. § 1623(a).

**D.      Hynes's claim of ineffective assistance of counsel lacks merit**

The final issue raised by Hynes is whether his trial counsel rendered constitutionally ineffective assistance. We typically decline to address claims of ineffective assistance on direct appeal and instead require defendants to file a postconviction motion to vacate their sentence pursuant to 28 U.S.C. § 2255. *See, e.g.*, *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005) (declining to address the defendants' ineffective-assistance claims). There is, however, "a narrow exception" to this rule "when the existing record is adequate to assess properly the merits of the claim." *United States v. Franklin*, 415 F.3d 537, 555-56 (6th Cir. 2005) (addressing the defendant's claim on direct appeal because "[t]he existing record [was] adequate" to determine whether counsel's conduct had prejudiced the defendant).

In the present case, the district court ruled on the claim as part of Hynes's motion for a new trial, both parties agree that the record is sufficiently developed to permit review, and the claim is easily resolved. We will therefore take up Hynes's claim in the interest of judicial economy. *Cf. United States v. Smith*, No. 90-2293, 1991 WL 182634, at *4 (6th Cir. Sept. 18, 1991) (unpublished) (reaching an ineffective-assistance claim for reasons of "judicial economy" where the claim rested

on counsel's "failure to object to the admission of certain evidence and the alleged prejudicial comments of the prosecutor in closing arguments").

We review de novo the district court's denial of an ineffective-assistance-of-counsel claim, *United States v. Jackson*, 181 F.3d 740, 744 (6th Cir. 1999), and evaluate the performance of Hynes's trial counsel under the familiar two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984). A defendant is deprived of the constitutional right to counsel under *Strickland* where "counsel's performance (1) 'fell below an objective standard of reasonableness' and (2) was prejudicial, i.e., 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Franklin*, 415 F.3d at 556 (quoting *Strickland*, 466 U.S. at 693-94)). We need not decide whether defense counsel performed deficiently if disposing of an ineffective-assistance claim on the ground of lack of sufficient prejudice would be easier. *Strickland*, 466 U.S. at 697. Because Hynes's claim can be readily resolved on the prejudice prong, we will therefore forego analysis of the deficient-performance prong.

Stated succinctly, the flaws that Hynes identifies in the performance of his trial counsel, even viewed cumulatively, did not prejudice him. Hynes first argues that his trial counsel erred by failing to question Cole about his possible motive of implicating Hynes in order to protect Cole's wife, who had also worked in the Property Room. But defense counsel repeatedly attacked Cole's credibility throughout the trial, bringing to the jury's attention the fact that Cole had received a drastically reduced sentence for his testimony against Hynes and that he had decided to plead guilty only after some of his own family members decided to testify against him on related charges.

Hynes has simply not shown how providing the jury with an alternative reason for Cole to lie would have affected the jury's decision to credit Cole's testimony. *See Stephens v. Hall*, 294 F.3d 210, 225-26 (1st Cir. 2002) (reversing the grant of habeas relief because the defendant suffered no prejudice where his attorney generally impeached the credibility of the key government witness, but failed to use the witness's prior criminal record to further undermine her credibility); *cf. Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005) (holding that counsel's failure to introduce mitigating evidence that would have been cumulative did not prejudice the defendant).

Finally, Hynes argues that his trial counsel rendered ineffective assistance by failing to object to (1) the introduction of alleged hearsay testimony, and (2) the manner in which the jury instructions characterized the credibility of Cole (who pled guilty) and Lasenby (who testified pursuant to an immunity agreement). These objections, once again, would not have altered the result of the trial. As to the first, this court has broadly construed the requirement that statements between coconspirators be "in furtherance" of the conspiracy to be admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence. *See Martinez*, 430 F.3d at 327. The two statements not objected to by Hynes's counsel—Cole's comment to Lasenby that Hynes was his "partner in crime" and Cole's statement to Lasenby that Hynes had asked whether Lasenby was his "outlet"—were not "idle chatter" as Hynes argues. Instead, the two comments could be construed as statements "made to apprise a coconspirator of the progress of the conspiracy, to induce his continued participation, [] to allay his fears," or "[s]tatements that prompt a coconspirator to act in a manner that facilitates the carrying out of the conspiracy, or that serve as a necessary part of the conspiracy by concealing or impeding the investigation." *Martinez*, 430 F.3d at 327. Any objection on this point would almost certainly have been overruled, so defense counsel's failure to object did not prejudice Hynes.

With respect to the second allegation, the district court properly instructed the jury to view with caution the testimony of both Cole and Lasenby. The jury instructions correctly distinguished between the two because only Lasenby had secured the dismissal of several charges against him in exchange for his testimony. Those instructions, moreover, correctly informed the jury that the testimony of cooperating witnesses would not suffice to convict Hynes unless the jury believed their

testimony beyond a reasonable doubt.  Defense counsel's failure to lodge an objection to these proper jury instructions, in sum, did not prejudice Hynes.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.