NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0407n.06
Case No. 19-3237

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jul 15, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| UGUNDA GIOVANNI SANDERS, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

_____/

Before: GUY, BOGGS, and WHITE, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** Ugunda Sanders pleaded guilty to possessing drugs in exchange for the dismissal of a related conspiracy charge. But not long after, he was charged with a similar conspiracy, albeit with different particulars. This time, Sanders chose to go to trial and a jury convicted him. He now cries foul, principally arguing that he was convicted for a crime for which he was never indicted. We affirm.

**I.**

Michael Davis was a practiced drug dealer. He sold marijuana as a teenager and later served time for trafficking cocaine. By 2015, Davis was in his forties and trafficking marijuana from California to Akron, Ohio, and toward the end of 2016, he began moving methamphetamine, too. Davis paid others to help him transport the drugs, which they did by stashing it in suitcases

and checking it as luggage on commercial flights. Transporters received $500, and then later $1,000, for each of these round trips. The flights were paid for with prepaid credit cards, and someone other than the transporter usually made all the arrangements.

Davis kept his circle of accomplices small. One accomplice was Michelle Duncan, a childhood friend. Another was housemate James Sanders. Davis had known James Sanders and his cousin, defendant Ugunda Sanders, since childhood and when Davis was asked at trial whether he was "aware if Ugunda Sanders and other members of the Sanders family knew that [Davis] dealt drugs," Davis replied, "Yes," adding, "it really wasn't too much of a secret."[1] Davis testified that Sanders asked to join in the drug operation either at the end of 2016 or the beginning of 2017 and, with instructions from Davis, Sanders flew out to California in January 2017 to pick up about 10 pounds of methamphetamine. According to Davis, Sanders made the same trip five to ten more times over the next few months. Often the drugs were stashed at the house shared by Davis and James.

Things began to unravel on June 28, 2017. That evening, state trooper Darrell Dowler was patrolling the highway and had a drug-sniffing canine with him. Dowler noticed an SUV following another vehicle too closely, so he pulled it over and when he approached the SUV he noticed that the driver and two passengers seemed "overly nervous." The driver was Sanders, and he told Dowler that he had just come from the airport, but he did not have a driver's license on him.

Police cameras captured the search that followed. Dowler removed Sanders from the car, and when he patted him down for weapons, he discovered $1,000 rolled up in his pocket. The canine alerted to drugs in the vehicle, and a search of it turned up an additional $5,000 in cash in

---

[1] For clarity, we will refer to the defendant as Sanders and his cousin as James.

the center console. In the trunk, Dowler found four suitcases, one of which had Sanders's name on it. Inside was 30 pounds of methamphetamine.

Police cameras also captured what was occurring inside Dowler's cruiser, where Sanders sat during the search. Before the police had even discovered the suitcases, Sanders called his girlfriend and told her that he was going to jail. He kept speaking as he watched the search progress, eventually stating, "[t]hey got everything." Using another phone, Sanders texted Davis, "all bad." He also called Davis, told him, "they got me," and at Sanders's behest, the two of them broke their phones.

At this point, the government did not know of the wider, Davis-led conspiracy. So the month after Sanders was arrested, a federal grand jury indicted him and the passengers on two counts. Count One was for conspiring "at least as early as June 28, 2017," to possess with the intent to distribute 500 grams of methamphetamine. Count Two was for actually possessing the drugs with that intention. Sanders was held in pretrial detention for the next few months while he prepared for trial and debated whether to accept a plea deal.

In the meantime, other members of Davis's operation kept transporting drugs. But they too began to get caught. In August, Michelle Duncan was caught with a suitcase of methamphetamine on her drive back from the airport. Then in September, a search of the stash house turned up packaged methamphetamine, including some in a suitcase. Davis and James were arrested soon after.

One month after the search of the stash house, in October 2017, the government filed a new indictment in a new case. That indictment did not name Sanders. But the government noticed similarities between this case and Sanders's and began to realize that the drug conspiracy was larger than the one for which Sanders was indicted.

Sanders accepted a plea deal in his own case two months later. He agreed to plead guilty to the possession count and, in exchange, the government would dismiss the conspiracy count. The agreement was clear, however, that the guilty plea covered only "conduct that occurred on June 28, 2017, and not any prior conduct."

While Sanders awaited sentencing, the government filed a superseding indictment in the other case. That indictment had two conspiracy counts. Count One named Davis and James as defendants and named, but did not indict, Sanders. It alleged a conspiracy that began "at least as early as February, 2016," and continued "through to January 2018." Count Six, on the other hand, named and indicted only Sanders, and alleged a conspiracy that began "at least as early as April, 2016," and continued "through to May 2017, the exact dates unknown." Davis, James, and the other defendants pleaded guilty, but Sanders went to trial on the sole count against him. A jury found Sanders guilty, and his current appeal concerns what happened at that trial.

## II.

Most of Sanders's arguments on appeal have to do with timing. Sanders was stopped on June 28, 2017, but was tried for a conspiracy that, according to the indictment, ended a month earlier, albeit with the caveat that the "exact dates [were] unknown." In Sanders's view, the gap in dates meant that mentioning the June 28 stop at trial introduced impermissible prior-bad-acts evidence forbidden by Federal Rule of Evidence 404(b)(1). Moreover, the arrests of conspirators after Sanders was already in custody—which occurred even longer after the conspiracy's putative end date—were likewise irrelevant to his guilt or innocence. Yet evidence of all of these events was introduced at trial. Sanders contends that admitting the evidence was error under the Federal Rules of Evidence and had the related effect of constructively amending the indictment, thereby

violating his constitutional rights.  We will begin by addressing the propriety of admitting the evidence and then consider the constitutional claim.

A.

Prior to trial, Sanders filed a motion in limine to exclude evidence of the June 28 stop—including the drugs found in his suitcase, the things he said and texted while sitting in the police cruiser, and what he said during jailhouse phone calls later on.  Sanders reasoned that it was inadmissible character evidence under Federal Rule of Evidence 404(b).  The government insisted that Rule 404(b) did not apply because the stop was admissible as *res gestae*, i.e., background evidence, and also because it showed a continuing pattern of illegal activity that was inextricably intertwined with the charged conspiracy.  Right before trial began, the court discussed the matter with the parties and decided that the government could talk about the traffic stop in opening arguments, but the court would give a jury instruction at that time about how the jury could consider the evidence.  The court gave an instruction during the government's opening, and gave similar instructions when the evidence itself came in and when delivering the final jury instructions.  Sanders did not object to the form of the instructions at the time, but now says those instructions were inadequate.

Although the district court seems to have reviewed the June 28 stop through the lens of Rule 404(b), we agree with the government that it is best understood as background evidence of "other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000).  We have explained:

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged

offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.

*Id.* When evidence truly satisfies that definition, it "does not implicate Rule 404(b)." *Id.*

Evidence of the June 28 stop and the subsequent arrests of co-conspirators fit the bill. Trial testimony well supported the conclusion that there was a single conspiracy, led by Davis, that began before Sanders got involved and continued after he was apprehended. True, Sanders was indicted for actions he took during only a portion of that time, while other defendants were indicted for a different, though fully overlapping, period. But that charging decision does not mean there were, in fact, two distinct conspiracies. And importantly, Sanders was charged in only one of them. *See Braverman v. United States*, 317 U.S. 49, 54 (1942) (recognizing that when a defendant makes a single agreement to commit a crime, "only the single penalty [for the conspiracy] can be imposed"). The June 28 stop and the subsequent arrests were all within three months of the end date in the indictment, and involved exactly the same people, places, and process of transporting drugs.

It also made sense to include the evidence in the government's case. The government's task at trial was to prove that Sanders (1) agreed to violate the law; (2) knew about the conspiracy and intended to join it; and (3) participated in the conspiracy. *United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020). To prove its case, the government needed to tell the story of how the conspiracy worked. That story reasonably included arrests that occurred after the charged conspiracy's ending because, according to the co-conspirators, their methods were the same all along. In fact, Michelle Duncan testified that the reason she took her final trip to California—which led to her arrest—was to raise money to bail Sanders out of jail. The evidence of the June 28 stop and the subsequent arrests of others gave background to the conspiracy and was therefore relevant.

"Even if evidence is *res gestae*, we must also find that the district court did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403." *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) (citation omitted). Although the jury was given limiting instructions under the purview of Rule 404(b) on how it could and could not consider Sanders's June 28 arrest, we recognize that these instructions are difficult for juries to follow and sometimes go unheeded. *See United States v. Johnson*, 27 F.3d 1186, 1194 (6th Cir. 1994) ("When prior acts evidence is introduced, regardless of the stated purpose, the likelihood is very great that the jurors will use the evidence precisely for the purpose it may not be considered; to suggest that the defendant is a bad person, a convicted criminal, and that if he 'did it before he probably did it again.'").

Nonetheless, here it was not an abuse of discretion to deem the evidence admissible. Our review requires us to "look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Chambers*, 441 F.3d 438, 456 (6th Cir. 2006) (quoting *United States v. Swift*, 809 F.2d 320, 323 (6th Cir. 1987)). Sanders's defense was that he was duped and that the dozens of flights he booked were part of his honest efforts to make money as a cook, clothing reseller, and casual booking agent for friends. In light of that defense, the probative value of evidence about his being stopped with 30 pounds of methamphetamine, the things he said to co-conspirators, and his hasty destruction of his phone—among other details—was not substantially outweighed by the risk of unfair prejudice.

## B.

The foregoing largely resolves Sanders's related argument that the government varied from or constructively amended the indictment. For context,

> [a]n indictment by a grand jury, which is itself a right guaranteed by the Constitution in federal prosecutions, also protects two other constitutional rights—the Sixth Amendment right to fair notice of the criminal charges against a defendant and the Fifth Amendment's protection against twice placing a defendant in jeopardy for the same offense.

*United States v. Hynes*, 467 F.3d 951, 961 (6th Cir. 2006) (citation omitted, alteration adopted).

These rights are violated when a defendant is charged with one crime, but then convicted of another. One way this can occur is through a variance, which happens "when the charging terms of an indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id.* (citation omitted). Another way is by constructive amendments, which "are variances occurring when an indictment's terms are effectively altered by the presentation of evidence and jury instructions that so modify essential elements of the offense charged that there is a substantial likelihood the defendant was convicted of an offense other than that charged in the indictment." *Id.* at 961–62 (citation omitted, alteration adopted). According to Sanders, the government offered evidence that he was guilty of conspiring as described in Count One (for which he was not indicted) and used it to convict him of conspiring as described in Count Six (for which he was indicted). He argues that, in doing so, the government constructively amended the indictment, or varied from it, such that the jury convicted him of Count One instead of Six.

We disagree. As already explained, the evidence suggested there was one conspiracy: the Davis conspiracy. Although that conspiracy stretched longer than the period laid out in Count Six, Duncan and Davis testified extensively about what Sanders did during the time period charged in the indictment. Moreover, the June 28 stop and subsequent arrests of others were still evidence that was probative for Count Six. The June 28 stop tended to show that Sanders was likely aware of the conspiracy a month earlier and his involvement was no mistake. And the arrests tended to

show that the very same people that Sanders was booking California flights for had been using those flights to transport methamphetamine. Consequently, there is not a "substantial likelihood" that Sanders was convicted of an offense other than the one charged in Count Six. *See United States v. Mize*, 814 F.3d 401, 409 (6th Cir. 2016).

C.

Sanders's final argument is that there was insufficient evidence to support a guilty verdict. Sanders says that Davis and Duncan were such unreliable witnesses that no reasonable jury could have relied upon them. And he claims that without their testimony there was not enough evidence to convict him. We reject this argument, too.

"[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Circumstantial evidence alone can be enough, *see United States v. Jones*, 124 F.3d 781, 784 (6th Cir. 1997), and there was plenty of circumstantial evidence here. Sanders booked more than two dozen one-way flights for other people, always between Akron and Los Angeles and always with prepaid credit cards. Some of those people were caught red handed with methamphetamine on their way home from the flights. Sanders booked those flights with his iPhone, yet he and Davis corresponded with prepaid flip phones, which they activated and destroyed in tandem. As for the credibility of Duncan and Davis, that was for the jury to decide, and in this regard we do not substitute its judgment with ours. *United States v. Smith-Kilpatrick*, 942 F.3d 734, 745 (6th Cir. 2019). Sanders has not carried the "heavy burden" required to overturn his conviction for insufficiency of the evidence. *See United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001).

**III.**

The judgment of the district court is AFFIRMED.